[No. S136154. May 31, 2007.]

MARC ANGELUCCI et al., Plaintiffs and Appellants, v.
CENTURY SUPPER CLUB, Defendant and Respondent

162

**COUNSEL**

The Rava Law Firm, Alfred G. Rava; Law Offices of Morse Mehrban and Morse Mehrban for Plaintiffs and Appellants.

The Sturdevant Law Firm, James C. Sturdevant and Monique Olivier for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Appellants.

Jennifer C. Pizer; Christine P. Sun, Hector P. Villagra; David Blair-Loy; and Tamara Lange for Lambda Legal Defense and Education Fund, Inc., American Civil Liberties Union Foundation of Southern California, American Civil

Liberties Union Foundation of San Diego & Imperial Counties and American Civil Liberties Union Foundation of Northern California as Amici Curiae on behalf of Plaintiffs and Appellants.

Harry Crouch for National Coalition of Free Men, Los Angeles Chapter, as Amicus Curiae on behalf of Plaintiffs and Appellants.

Law Offices of Steven L. Martin and Steven L. Martin for Defendant and Respondent.

Payne & Fears, Daniel L. Rasmussen and Julie J. Bisceglia for Corinthian Colleges as Amicus Curiae on behalf of Defendant and Respondent.

Deborah J. La Fetra and Timothy Sandefur for Pacific Legal Foundation as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**GEORGE, C. J.**—We granted review in the present case to determine whether, in order to state a claim under Civil Code section 52, subdivision (a), the relevant remedial provision of the Unruh Civil Rights Act (Civ. Code, § 51 et seq.; also hereinafter sometimes referred to as the Act), plaintiffs must demonstrate that they affirmatively requested nondiscriminatory treatment and were refused.[1]

■ As we shall explain, we conclude that the text of the Act does not support defendant's and the Court of Appeal's assertion that, in order to recover under the Act, plaintiffs who are discriminated against when they present themselves at a business establishment and pay the price of admission also must demand equal treatment and be refused. Nor do we believe it would be consistent with the policy of the Act, or with our case law, to read such a requirement into the language of the Act. Accordingly, the judgment rendered by the Court of Appeal is reversed.

I

Plaintiffs Marc Angelucci, Edgar Pacas, Elton Campbell, and Jeff Kent filed a complaint against Century Supper Club (the club) for violation of the Unruh Civil Rights Act and the Gender Tax Repeal Act of 1995 (§ 51.6).[2]

---

[1] Statutory references are to the Civil Code unless otherwise indicated.

[2] This statement of facts is based upon the recital contained in the Court of Appeal's opinion.

The complaint alleged that plaintiffs patronized the club on several occasions in June and July 2002, and were charged an admission fee higher than that charged to women. Specifically, the complaint alleged that two of the plaintiffs were charged $20 for admission on June 14, 2002, although the admission fee for women was $15, that they again were charged $20 for admission two days later, although women were admitted free, and that the other plaintiffs patronized the club on several occasions and experienced similar treatment. Plaintiffs alleged they were charged higher prices because they are men.[3] They sought statutory damages under section 52, subdivision (a) (section 52(a)), the relevant portion of the remedy provision of the Unruh Civil Rights Act and the related Gender Tax Repeal Act.

The club moved for judgment on the pleadings, arguing that plaintiffs could not recover under section 52(a) for violations of the Unruh Civil Rights Act or the Gender Tax Repeal Act, because they had not alleged they had asked the club to be charged at the same rate as female patrons.[4] Defendant claimed that without having made such requests, plaintiffs could not prevail. The trial court agreed with defendant and entered judgment in its favor.

Plaintiffs appealed and the Court of Appeal affirmed, holding that section 52(a) provides a remedy only to those plaintiffs who request nondiscriminatory treatment and are refused. The appellate court relied principally upon language in this court's decision in *Koire v. Metro Car Wash* (1985) 40 Cal.3d 24 [219 Cal.Rptr. 133, 707 P.2d 195] (*Koire*) and characterized that case as "holding that there must be an affirmative assertion of the right to equal treatment . . . based on the fact that there cannot be a discrimination or a denial of services unless services are requested. The principle is consistent with long-standing California law . . . which holds that a plaintiff cannot sue for discrimination in the abstract, but must actually suffer the discriminatory conduct." The Court of Appeal added that the requirement that the plaintiff demand equal treatment "ensures that the statutes will be used to redress genuine grievances and to punish genuine misconduct, not by those who seek to exploit the law for financial gain," citing *Reese v. Wal-Mart Stores, Inc.* (1999) 73 Cal.App.4th 1225, 1236 [87 Cal.Rptr.2d 346] (*Reese*). The Court of Appeal concluded that its analysis would apply equally to plaintiffs' claims

---

[3] According to the Court of Appeal, shortly after filing the above complaint, plaintiff Campbell sued the club and other establishments in another case. In that case Campbell alleged that he went to the club on July 20, paid $20 admission though women were admitted free, and was subjected to a search of his person although women were not searched. The two cases were consolidated.

[4] For the purposes of the motion, the parties agreed that plaintiffs had not asked to be admitted at the rate charged to female patrons.

under the Unruh Civil Rights Act and the Gender Tax Repeal Act, observing that the parties had not separately addressed the Gender Tax Repeal Act.[5]

We granted plaintiffs' petition for review.

## II

### A

In an appeal from a motion granting judgment on the pleadings, we accept as true the facts alleged in the complaint and review the legal issues de novo. "A motion for judgment on the pleadings, like a general demurrer, tests the allegations of the complaint or cross-complaint, supplemented by any matter of which the trial court takes judicial notice, to determine whether plaintiff or cross-complainant has stated a cause of action. [Citation.] Because the trial court's determination is made as a matter of law, we review the ruling de novo, assuming the truth of all material facts properly pled." (*Leko v. Cornerstone Bldg. Inspection Service* (2001) 86 Cal.App.4th 1109, 1114 [103 Cal.Rptr.2d 858].)

### B

In pertinent part, the Act provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (§ 51, subd. (b).)

The Act includes an enforcement provision that authorizes individual actions. Section 52(a) provides that "[w]hoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51, 51.5, or 51.6 [the Gender Tax Repeal Act], is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the

---

[5] The parties do not dispute the conclusion of the Court of Appeal that private actions for violations of section 51.6, the Gender Tax Repeal Act, are governed by the same provision, section 52(a), that applies to Unruh Civil Rights Act violations, and that plaintiffs' claim under the Gender Tax Repeal Act is subject to the same analysis and outcome with respect to the issues of notice and injury. Thus we do not separately consider the latter act. Defendant asserts, however, that the Gender Tax Repeal Act does not apply in the first instance to plaintiffs' claim, because defendant's conduct did not involve the provision of "services." The record does not reflect that defendants raised this issue in the Court of Appeal, and that court did not reach the issue. Accordingly, we decline to reach it.

amount of actual damage but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51, 51.5, or 51.6."[6]

■ As we have declared in past cases, the Act must be construed liberally in order to carry out its purpose. (*Koire, supra*, 40 Cal.3d at p. 28.) The Act expresses a state and national policy against discrimination on arbitrary grounds. (*Burks v. Poppy Construction Co.* (1962) 57 Cal.2d 463, 471 [20 Cal.Rptr. 609, 370 P.2d 313].) Its provisions were intended as an active measure that would create and preserve a nondiscriminatory environment in California business establishments by "banishing" or "eradicating" arbitrary, invidious discrimination by such establishments. (*Isbister v. Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72, 75–76 [219 Cal.Rptr. 150, 707 P.2d 212] (*Isbister*) [referring to a legislative desire to " 'banish such [discriminatory] practices from California's community life' "]; *Koire, supra*, 40 Cal.3d at p. 36 [observing that the purpose expressed by the Act and other enactments is the "eradication" of discrimination based upon sex]; *In re Cox* (1970) 3 Cal.3d 205, 212 [90 Cal.Rptr. 24, 474 P.2d 992] [speaking of a patent legislative purpose to "interdict" the arbitrary discrimination targeted by the Act].)

The Act stands as a bulwark protecting each person's inherent right to "full and equal" access to "all business establishments." (§ 51, subd. (b); see *Isbister, supra*, 40 Cal.3d at p. 75.) The Act, like the common law principles upon which it was partially based, imposes a compulsory duty upon business establishments to serve all persons without arbitrary discrimination. (*Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 738 [180 Cal.Rptr. 496, 640 P.2d 115]; see also *Warfield v. Peninsula Golf & Country Club* (1995) 10 Cal.4th 594, 607–608 [42 Cal.Rptr.2d 50, 896 P.2d 776].) The Act serves as a preventive measure, without which it is recognized that businesses might fall into discriminatory practices. (*Isbister, supra*, 40 Cal.3d at p. 75.)

---

[6] Section 51.6 states in pertinent part that "[n]o business establishment of any kind whatsoever may discriminate, with respect to the price charged for services of similar or like kind, against a person because of the person's gender." (§ 51.6, subd. (b).) In a provision inapplicable to the present case, the statute imposes upon certain businesses a duty to disclose prices and post a notice confirming that prices must not be discriminatory. (§ 51.6, subd. (f).) Failure to comply with the disclosure duty subjects the enumerated business to a $1,000 civil penalty if the business "fails to correct a violation of this subdivision within 30 days of receiving written notice of the violation . . . ." (§ 51.6, subd. (f)(5).) In all other respects, "the remedies for a violation of [section 51.6] are the remedies provided in subdivision (a) of Section 52." (§ 51.6, subd. (d).)

## C

In interpreting a statute, we first consider its words, giving them their ordinary meaning and construing them in a manner consistent with their context and the apparent purpose of the legislation. (*Fitch v. Select Products Co.* (2005) 36 Cal.4th 812, 818 [31 Cal.Rptr.3d 591, 115 P.3d 1233].)

As can be seen from the statutory language quoted above, the Act does not contain express language requiring that before a legal action may be filed, the victim of the asserted discrimination must have demanded equal treatment and have been refused. Unlike some other remedy statutes, the Act, and specifically section 52(a), does not establish as a condition of instituting a lawsuit that the defendant have been given notice and an opportunity to correct the asserted violation. (Cf. § 51.6, subd. (f)(5) [under the Gender Tax Repeal Act, a 30-day notice is required prior to filing suit premised upon the failure of a business establishment of a specified type to post notice of its prices and of its nondiscriminatory pricing policy]; see also § 1782, subd. (a) [specifically requiring that one seeking damages for unfair or deceptive practices under the Consumers Legal Remedies Act (§ 1750 et seq.) notify the person responsible for the violation and demand rectification 30 days prior to filing suit]; Health & Saf. Code, § 25249.7, subd. (d)(1) [requiring that private persons seeking damages for violation of the Safe Drinking Water and Toxic Enforcement Act (Health & Saf. Code, § 25249.5 et seq.) provide notice to certain public entities and the alleged violator 60 days prior to filing suit].)

According to the Court of Appeal, however, plaintiffs were not "denied" their rights within the meaning of the Act, because they did not suffer refusal of an express demand that defendant accord them equal treatment. The Court of Appeal pointed to statutory language it believed supported its conclusion. Section 52(a) provides for a civil action against "[w]hoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to" the Unruh Civil Rights Act (or the Gender Tax Repeal Act). According to the appellate court, "there cannot be a discrimination or denial of services unless services are requested." In essence, the Court of Appeal posited that the word "denies" as used in section 52(a) connotes only a responsive measure—a business establishment's response to a demand for equal accommodation.

This linguistic argument is unpersuasive. Dictionaries define the term "deny" as commonly meaning to "withhold" (Ballentine's Law Dict. (3d ed. 1969) p. 334) or to "deprive" (Garner's Dict. of Modern Legal Usage (2d ed. 1995) p. 265 [complaining that, although this usage is common, it is inaccurate]). We note that the federal Constitution uses the term "deny" in the equal protection clause and other provisions, but we are unaware of any

authority supporting the startling proposition that a right acknowledged by these provisions is not "denied" if the victim is a passive sufferer of discrimination rather than a person who expressly demands his or her rights and is refused. (See U.S. Const., 14th Amend. ["nor shall any state . . . deny to any person within its jurisdiction the equal protection of the laws"]; see also *id.*, 15th Amend. ["The right of citizens . . . to vote shall not be denied or abridged . . . on account of race, color, or previous condition of servitude"]; *id.*, 19th Amend. ["The right of citizens . . . to vote shall not be denied or abridged . . . on account of sex"]; *id.*, 26th Amend. ["The right of citizens . . . who are eighteen years of age or older . . . to vote shall not be denied or abridged . . . on account of age"].) And the language of section 52(a) permitting a private action against any business establishment that "makes any discrimination or distinction" in violation of the Act, contains no implication whatsoever that a business establishment violates the Act only if it refuses an express demand for equal treatment.

The interpretation offered by the Court of Appeal and endorsed by defendant also would be inconsistent with the purpose of the Act to "eradicate" or "eliminate" arbitrary, invidious discrimination in places of public accommodation. As we have explained, the Act imposes a duty upon business establishments to refrain from arbitrary discrimination. If businesses are held not to violate the Act or inflict injury unless they are challenged by a patron, their ordinary practice may revert to discrimination, with special exceptions being made for individuals who happen to challenge the practice. Contrary to the purpose of the Act to eradicate discrimination, the Court of Appeal's interpretation leaves business establishments free to advertise and provide gender-based discounts and, presumably, to engage in other forms of discrimination that violate the Act, so long as these establishments agree to provide equal treatment to those customers knowledgeable and assertive enough to demand it.

It is instructive to consider early examples of unequal treatment on the basis of race that we found to constitute violations of the Act's predecessor civil rights statutes. In these cases, instances of racial segregation in the provision of accommodations were held to violate California's antidiscrimination laws. Violations occurred when African-American ticket holders were admitted to a movie theater or racetrack clubhouse or gained access to a soda fountain, but, because of their race, were restricted to a segregated or otherwise substandard area. (See *Suttles v. Hollywood Turf Club* (1941) 45 Cal.App.2d 283, 287 [114 P.2d 27]; *Hutson v. The Owl Drug Co.* (1926) 79 Cal.App. 390, 392 [249 P. 524]; *Jones v. Kehrlein* (1920) 49 Cal.App. 646, 651 [194 P. 55].) It would be absurd to conclude that such civil rights act violations occurred only when the African-American patrons expressly demanded that their treatment be equivalent to that accorded the White patrons

in those situations. Actionable discrimination obviously occurred in these early cases—and such conduct would constitute discrimination under the current Act.

The Court of Appeal's interpretation also would leave without redress those persons who discover only *after the fact* that they have suffered discrimination in violation of the Act. For example, an African-American family seeking to purchase a home may not realize that the real estate agency they employed has discriminated against them on the basis of race by failing to disclose to them eligible homes in a White-majority neighborhood until after the agency has concluded its services. At that point a demand for equal treatment and a refusal on the part of the agency would be pointless. Also denied redress under the foregoing interpretation would be persons discriminated against on an occasion when there was no one present to receive and answer a demand for equal treatment (for example, persons encountering, as they did in past decades, racially segregated drinking fountains or restroom facilities at an unattended structure).

D

In support of its argument that relief under section 52(a) is limited to persons who demand equal treatment and are refused, defendant relies upon certain early decisions that also formed the basis for the Court of Appeal's holding. These decisions are of no assistance to defendant. They arose in the context of a business establishment's asserted discriminatory *exclusion* of patrons and stand at most for the proposition that persons who were not patrons of a business establishment or who did not present themselves for service or access as a patron and tender the price of admission did not adequately allege injury under the predecessor to the Act.

In *Weaver v. Pasadena Tournament of Roses* (1948) 32 Cal.2d 833 [198 P.2d 514], the plaintiff alleged that he waited in line to purchase a ticket to the Rose Bowl football game but was unable to obtain one, because fewer tickets were available for sale than had been promised. The plaintiff sought to bring an action on behalf of all persons who stood in line for tickets but were unable to purchase them because of the shortfall. This court concluded the case was not actionable as a *representative* suit because the question, as to each individual plaintiff, was whether he or she presented himself or herself, demanded admittance to the game, and tendered the price of a ticket. (*Id.* at p. 838.) Thus the issue in *Weaver* was whether the plaintiff, who properly *had* presented himself, sought admittance, and tendered the price of the ticket, could represent a class of persons who may *not* have done so. By contrast, in the present case, each plaintiff presented himself for admittance, paid the price of admission, and entered the establishment. (See also *Bartlett v.*

■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■

*Hawaiian Village, Inc.* (1978) 87 Cal.App.3d 435, 438–439 & fn. 6 [151 Cal.Rptr. 392] [denying class certification in litigation under the Act because individual issues would predominate—issues such as whether each individual presented himself or herself for admission at the defendant nightclub].)

In *Orloff v. Hollywood Turf Club* (1952) 110 Cal.App.2d 340 [242 P.2d 660], the plaintiff was ejected from a racetrack and was told he would not be admitted in the future. He sued under a predecessor to the Act, seeking damages for his nonadmission on each day the track was open, claiming he was entitled to damages *for the days he did not seek admission.* The court rejected his claim for damages for days on which he had not presented himself for admission and tendered the price of a ticket, commenting that the defendant had no duty to the plaintiff under the Act until the plaintiff tendered either an admission ticket or the price of admission. (110 Cal.App.2d at pp. 342–343.) By contrast, again, in the present case plaintiffs did present themselves for admission and paid the price charged by defendant. It cannot be said that defendant had no duty to refrain from discriminating under these circumstances.

Defendant also claims its interpretation of the Act is consistent with *Crowell v. Issacs* (1965) 235 Cal.App.2d 755 [45 Cal.Rptr. 566] (*Crowell*) and *Hales v. Ojai Valley Inn & Country Club* (1977) 73 Cal.App.3d 25 [140 Cal.Rptr. 555] (*Hales*). In *Crowell*, plaintiffs, White persons, filed suit against their real estate agent, under the predecessor to the Act, for failing to seek out qualified African-American purchasers for their home. The court held that the agent's mere failure to seek out African-American purchasers did not constitute discrimination against the plaintiff sellers. The court also observed that circumstances might exist in which "mere quiescent inaction" could constitute discrimination, providing the example of an agent's failure to show a home to African-American potential purchasers who contact the agent seeking a purchase in the style and price range of the home. (*Crowell*, at p. 757.)

From this example of a situation not actually presented by the *Crowell* case, defendant derives the rule that the plaintiffs must "seek the very rights or access he or she claims was denied." But plaintiffs did seek access to defendant's club. They do not accuse defendant in the present case of mere inaction, and the *Crowell* decision does not support defendant's view that a plaintiff must demand expressly that his or her rights be honored. The court's example in *Crowell* of potentially actionable conduct posited African-American purchasers who desired a certain type of home, but did not suggest such purchasers would be required to demand that they be shown homes *on the same basis as White potential purchasers.* In addition, the court announced in *Crowell* that the more significant ground for its decision was that the reason the plaintiffs were not entitled to a remedy was that it was not *they*

who had been denied the rights guaranteed by the civil rights act, and that they did not purport to sue as representatives of other aggrieved persons. (*Crowell, supra*, 235 Cal.App.2d at p. 757.) The White sellers in *Crowell* were not the victims of any discrimination against African-American persons, whereas *in the present case plaintiffs were the persons who were disadvantaged by defendant's discriminatory pricing.*

Defendant's citation to *Hales, supra*, 73 Cal.App.3d 25, is equally unhelpful. There the court determined that the plaintiff could state a claim under the Act by alleging that when he entered a restaurant seeking food and drink, he was told he could not be served unless he wore a tie, but that at the same time the restaurant permitted female patrons to be served in less formal attire. Nothing in the decision indicates that the plaintiff demanded that he receive the same treatment as female patrons, nor does the decision in any way establish such a requirement. (73 Cal.App.3d at pp. 28, 30.)[7]

According to the Court of Appeal, the requirement that a plaintiff request equal treatment and suffer denial "ensures that the statutes will be used to redress genuine grievances and to punish genuine misconduct, not [to assist] those who seek to exploit the law for financial gain." In support of this conclusion, the Court of Appeal cited *Reese, supra*, 73 Cal.App.4th 1225.

In *Reese, supra*, 73 Cal.App.4th 1225, the plaintiff filed a motion for class certification in an action alleging violations of the Unruh Civil Rights Act and the Gender Tax Repeal Act, based upon Wal-Mart's practice of offering a "Ladies' Day" discount at facilities that offered automotive oil changes. Wal-Mart moved for summary judgment in the underlying action on the ground that the plaintiff deliberately had refrained from requesting to receive the discount, but the trial court *denied* the motion for summary judgment (*Reese*, at p. 1232), and the issue was *not reached on appeal.* Rather, the issue on appeal was the propriety of the trial court's order denying the plaintiff's motion to certify the class. The Court of Appeal held that the trial

---

[7] Defendant claims "other states that have judicially abolished discounts for women have similarly decreed that it is the failure to give an advertised discount to men that is improper, not merely the offer of a 'Ladies' Day' discount or preference." The authorities cited in support do not assist defendant. In *Ladd v. Iowa West Racing Ass'n* (Iowa 1989) 438 N.W.2d 600, 602, the court actually declared that the promotional campaign itself "was clearly violative of the statute" because of the advantage given to women. *Peppin v. Woodside Delicatessen* (1986) 67 Md.App. 39 [506 A.2d 263] similarly does not support defendant's position. On the contrary, that case involved a challenge to the *practice* of a business establishment. The court affirmed an administrative agency's determination that the defendant's promotional campaign offering discounts for persons wearing skirts constituted a discriminatory practice, because the "overwhelming majority of discount recipients" were female and the evidence demonstrated that the defendant's practice of requiring patrons to wear a skirt in order to receive the discount was intended to and did have the same effect as a "Ladies' Night." (*Id.*, 506 A.2d at p. 266.)

court appropriately determined the plaintiff had not demonstrated that substantial benefits would accrue to the litigants or the courts from class treatment. The trial court appropriately could doubt that class certification was necessary to avoid multiple lawsuits. A multiplicity of claims was unlikely, because no other aggrieved party had brought suit over the years the discount had been offered and the plaintiff himself had generated his own injury by patronizing Wal-Mart for the purpose of being denied the "Ladies' Day" discount. Stating it would *not* express an opinion on the propriety of the plaintiff's substantive claim, the Court of Appeal concluded "the trial court could reasonably conclude that it would likely not have to adjudicate a multiplicity of actions if the class was not certified." (*Id.* at p. 1236.)

As our description of the case makes plain, the decision in *Reese* did not suggest that a plaintiff must demand equal treatment and be refused in order to be able to state a claim under the Act. Moreover, the court's discussion in *Reese* demonstrates that the safeguard proposed by the Court of Appeal in the present case might not meet its salutary goal. As the court in *Reese* pointed out, the plaintiff in that case consulted his lawyer for the purpose of *finding* a lawsuit, and only *subsequently* presented himself to Wal-Mart for service on "Ladies' Day." (*Reese, supra*, 73 Cal.App.4th at p. 1236 ["Whereas most litigants consult with a lawyer after an injury to seek judicial redress, this client went to his lawyer to seek an injury for which he could claim judicial redress"].) It is precisely such a well-instructed professional plaintiff, in contrast to the untutored victim of discrimination, who would possess the information necessary to enable him or her to *comply* with the Court of Appeal's suggestion that plaintiffs be required to demand equal treatment and secure a refusal.

E

According to the Court of Appeal, under the circumstances alleged in the complaint, plaintiffs did not suffer an injury. But our decision in *Koire, supra*, 40 Cal.3d 24, held that a business establishment's policy of affording price discounts to female patrons purely on the basis of gender ordinarily constitutes unlawful discrimination against male patrons within the meaning of the Act, and we concluded the plaintiffs in that case were injured within the meaning of the Act when they presented themselves for admission and were charged the nondiscounted price.[8]

In *Koire, supra*, 40 Cal.3d 24, the plaintiff, a male, alleged that he had visited several car wash establishments on "Ladies' Day" and requested

---

[8] Amicus curiae for defendant, Pacific Legal Foundation, has asked us to reconsider our conclusion in *Koire*. However, that issue is not within the scope of review and, accordingly, is not properly before us.

services at the discounted rate offered to female customers. The businesses refused. The plaintiff also alleged that he visited bars that offered discounted admission prices to female patrons and that on one occasion, he visited a bar and asked for the free admission that was being accorded to female patrons, but was refused. The trial court granted judgment in favor of the defendant business owners after trial on the plaintiff's Unruh Civil Rights Act claims, concluding that the discounts did not violate the Act.

This court reversed the judgment rendered in favor of the defendants. We concluded that the language of the statute encompasses not solely access to business establishments, but also treatment of patrons. We also set forth the examples noted above of cases in which courts identified racial segregation within theaters and eating establishments as violative of the predecessor to the Act. Our opinion concluded: "The Act's proscription is broad enough to include within its scope discrimination in the form of sex-based price discounts." (*Koire, supra*, 40 Cal.3d at p. 30.)

We rejected the defendants' claim that gender-based price discounts do not constitute arbitrary discrimination within the meaning of the Act. Acknowledging the existence of circumstances in which either the patron's conduct or the nature of the business establishment might warrant an exception to the Act (*Koire, supra*, 40 Cal.3d at pp. 31–32), we declined to extend such exceptions to gender-based price discounts of the type challenged in the case. (*Id.* at pp. 32–33.)

■ In response to the *Koire* defendants' claim that their gender-based price discounts did not injure either men or women and, specifically, did not injure the plaintiff, we commented that the Act renders "arbitrary sex discrimination by businesses . . . *per se* injurious." (*Koire, supra*, 40 Cal.3d at p. 33.) As we stated, "Section 51 provides that all patrons are entitled to *equal* treatment. Section 52 provides for minimum statutory damages . . . for *every* violation of section 51, *regardless* of the plaintiff's actual damages." (*Ibid.*)

Moreover, we explained, the plaintiff suffered actual damage. Referring to circumstances that also occurred in the present case, we observed: "The plaintiff *was* adversely affected by the price discounts. His female peers were admitted to the bar free, while he had to pay. On the days he visited the car washes, he had to pay more than any woman customer, based solely on his sex." (*Koire, supra*, 40 Cal.3d at p. 34.)

■ Finally, we predicted that our holding would not put an end to proper, *non*discriminatory promotional price discounts, and we described policies permitting, for example, discounts based upon age for children or older

persons. (*Koire, supra*, 40 Cal.3d at pp. 36–38 ["the fact that sex-based price discounts are not permissible does not have an impact on the validity of age-based discounts"]; see also *Pizarro v. Lamb's Players Theatre* (2006) 135 Cal.App.4th 1171, 1175 [37 Cal.Rptr.3d 859].) We also acknowledged there might be public policies warranting differential treatment of male and female patrons under *some* circumstances, but "[t]he plain language of the Unruh [Civil Rights] Act mandates equal provision of advantages, privileges and services in business establishments of this state. Absent a compelling social policy supporting sex-based price differentials, such discounts violate the Act." (*Koire, supra*, 40 Cal.3d at p. 38.)

In sum, *Koire* interpreted the Act as broadly condemning any business establishment's *policy* of gender-based price discounts. Further, *Koire* determined that injury occurs when the discriminatory policy is *applied* to the plaintiff—that is, at the time the plaintiff patronizes the business establishment, tendering the nondiscounted price of admission.

Even in light of the *Koire* decision's broad definition of injury, of course, a plaintiff must have standing to bring an action under the Act. We do not dispute the Court of Appeal's admonition that "a plaintiff cannot sue for discrimination in the abstract, but must actually suffer the discriminatory conduct."

In general terms, in order to have standing, the plaintiff must be able to allege injury—that is, some "invasion of the plaintiff's legally protected interests." (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 862, p. 320; see Code Civ. Proc., § 367 ["Every action must be prosecuted in the name of the real party in interest, except as otherwise provided by statute"].)

Standing rules for actions based upon statute may vary according to the intent of the Legislature and the purpose of the enactment. (*Midpeninsula Citizens for Fair Housing v. Westwood Investors* (1990) 221 Cal.App.3d 1377, 1385 [271 Cal.Rptr. 99]; see also *Librers v. Black* (2005) 129 Cal.App.4th 114, 124 [28 Cal.Rptr.3d 188].) In essence, an individual plaintiff has standing under the Act if he or she has been the victim of the defendant's discriminatory act. (*Midpeninsula Citizens for Fair Housing v. Westwood Investors, supra*, 221 Cal.App.3d at pp. 1383, 1386 [standing under the Act extends to persons "actually denied full and equal treatment by a business establishment"—that is, to "victims of the discriminatory practices"].)

Plaintiffs adequately alleged they had suffered an "invasion of . . . legally protected interests" (5 Witkin, Cal. Procedure, *supra*, Pleading, § 862, p. 320) sufficient to afford them an interest in pursuing their action vigorously. According to their allegations, each of the plaintiffs was subjected to, and

paid, defendant's gender-based price differential. Accepting plaintiffs' factual allegations as true, as we are required to do in reviewing a judgment entered on the pleadings, plaintiffs must be considered "person[s] denied the rights provided in Section 51." (§ 52(a).)

F

The Court of Appeal and defendant assert that in *Koire, supra*, 40 Cal.3d 24, we actually *adopted* their view of the nature of an injury under the Act. In support, they rely upon a single sentence contained in a footnote appearing in the *Koire* decision's statement of facts. This reliance is unwarranted.[9] Not only is it unreasonable to suppose that such a reference in a footnote in our statement of facts was intended to establish a new and essential element of a cause of action under the Act, the conclusion advanced by defendant—that a violation or injury occurs only after a demand for equal treatment has been refused—is contrary to our legal analysis in *Koire* and to the purpose of the Act.

Our statement of facts in *Koire* recounted that the plaintiff visited several car wash establishments on "Ladies' Day" and was refused when he asked to be charged the same price as women customers. The plaintiff in that case also asked to be charged the same night club admission fee as women patrons and was refused. We footnoted the circumstance that in the instance of one of the car wash establishments, it was clear the plaintiff asked for equal treatment, but there was a factual dispute as to whether the defendant explicitly refused. The dispute was inconsequential, we explained, because whether or not defendant refused a request, it was undisputed that the car wash advertised a "Ladies' Day" policy that forced male customers who sought the discount to ask for it affirmatively. We employed the following language: "There was conflicting testimony at trial about whether defendant State College Car Wash refused to wash plaintiff's car for the reduced 'Ladies' Day' price. The trial court did not resolve the factual dispute, since it held as a matter of law that 'Ladies' Day' discounts do not violate the Unruh Civil Rights Act. State College Car Wash does not deny that it advertises special 'Ladies' Day' prices. At a minimum, men who wish to be charged the same price as women on 'Ladies' Day' must affirmatively assert their right to equal treatment." (*Koire, supra*, 40 Cal.3d at p. 27, fn. 3.)

The Court of Appeal declared: "The Supreme Court made the statement in a footnote, and the footnote appended to the sentence that tells us that most of the car washes refused plaintiff's request for the discounted price. The

---

[9] Accordingly, we reject the view of the Court of Appeal that the Legislature has acquiesced in that interpretation of *Koire*.

Supreme Court reversed the judgment in favor of the defendants and remanded the case to the trial court 'for further proceedings consistent with the views expressed herein.' The Court thus directed the trial court to resolve the factual dispute in light of the holding that sex-based price discounts violate the Unruh [Civil Rights] Act. By so doing, *it implicitly held* that a denial of services . . . is necessary to state a claim for sex-based price discrimination under the Unruh Civil Rights Act. Further, the 'at a minimum' language, following as it does the statement that '[defendant] does not deny that it advertises special "Ladies' Day" prices,' establishes that mere[ly] advertising a sex-based price discount does not violate the Unruh Civil Rights Act."

The Court of Appeal misread our footnote in several ways. The quoted footnote cannot be construed as a holding, implicit or otherwise, on any point of law. The footnote appears in a statement of facts, not in the context of any legal analysis. Moreover, our point was not that a violation or injury would not occur under the Act unless the defendant refused the plaintiff's request to grant a discount. We found that the factual dispute concerning whether a particular defendant refused to grant the plaintiff a discount was of no consequence, because it was undisputed that the defendant had a discriminatory policy that would force men to ask for the discount if they wanted to receive it. The words "[a]t a minimum" noted that a man would be required to request to be treated equally if he was to have any chance of avoiding discriminatory treatment, the implication being that even such a request might not secure equal treatment. (*Koire, supra*, 40 Cal.3d at p. 27, fn. 3.) Our remand order responded to the circumstance that the trial court (apparently sitting as the trier of fact) had granted judgment for the defendants primarily upon a legal ground—that is, its belief that gender-based price discounts do not violate the Act. The trial court's legal error in concluding that the Act did not apply to gender-based price discounts undermined the entire judgment it rendered. Our reversal signified that the entire matter could be retried. We did not direct the trier of fact to resolve any particular factual dispute.

Most significantly, in the present case the Court of Appeal's interpretation of the Act is fundamentally inconsistent with the legal analysis contained in our *Koire* decision. As noted, our actual discussion and analysis of the applicable legal principles concluded that gender-based price discounts, such as were alleged in that case, violated the Act, that arbitrary gender discrimination is per se injurious, and that the particular plaintiff suffered actual injury because he paid more for admission or services than female patrons. (*Koire, supra*, 40 Cal.3d at pp. 33–34.) Nothing in our discussion of the legal issues suggested the Act is not violated and an injury does not occur unless the victim of discrimination not only tenders the price of admission but also demands equal treatment and is refused.

## III

The trial court's and the Court of Appeal's interpretation of section 52(a) reflects in part defendant's assertion that Angelucci and the other men involved in the present case are professional plaintiffs who "shake down" business entities on the basis of assertedly technical violations of civil rights laws and similar enactments, and that they and their attorneys engage in this practice simply to make a living—unmotivated by any desire to eliminate discrimination or to redress any actual injury. Defendant claims that plaintiffs made *repeated* unannounced visits to defendant's business establishment in order to increase the statutory damages they could seek for multiple violations of the Act, and defendant accuses plaintiffs and their attorneys of being "bounty hunters" who have been involved in numerous similar lawsuits. Defendant also contends that meritless, abusive litigation of this type is proliferating in California and generally results in the extortion of a settlement on the basis of the plaintiff's unsupported factual allegations.[10]

---

[10] We are aware that legislators, courts, and commentators at the state and national level have been troubled that the enactment of a private right of action intended to enforce certain types of civil rights legislation may have led to an explosion of assertedly unwarranted or unduly burdensome individual lawsuits brought by professional plaintiffs and bounty-hunting attorneys against business establishments. Much of the debate arises in the context of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.) (ADA) and specifically in the context of claims against private property owners for alleged denial of access. Some writers have argued that compliance with the ADA remains elusive, justifying the continued use of the private right of action in spite of occasional abuse. (See Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation* (2006) 54 UCLA L.Rev. 1, 15, 21 ["whether a class of litigation unduly burdens the courts necessarily depends on a normative assessment of the importance of that class"].)

Other commentators chronicle instances in which a single plaintiff or law firm filed hundreds of ADA claims, some alleging assertedly technical or de minimis variations from applicable accessibility standards, and the authors consider whether such asserted litigation abuse warrants restriction of remedies under the ADA. (See Becker, *Private Enforcement of the Americans with Disabilities Act via Serial Litigation: Abusive or Commendable?* (2006) 17 Hastings Women's L.J. 93, 97–99, 113 [describing assertedly abusive ADA litigation in Pennsylvania, Florida, and California and suggesting adoption of "safe harbor" provision in the ADA to protect businesses that undertake good faith efforts to make premises accessible]; McCabe, *California Disability Anti-Discrimination Law: Lighthouse in the Storm, or Hunt for Buried Treasure?* (2005) 36 McGeorge L.Rev. 661, 679–681, 686–689 [noting the problem and describing the debate]; see also Milani, *Go Ahead, Make My 90 Days: Should Plaintiffs Be Required to Provide Notice to Defendants Before Filing Suit Under Title III of the Americans with Disabilities Act?* (2001) 2001 Wis. L.Rev. 107, 185 [arguing that title III of the ADA already incorporates a notice provision from another statute].)

Courts in this state have expressed similar concerns in the context of litigation under the Safe Drinking Water and Toxic Enforcement Act (Health & Saf. Code, § 25249.5; see *Consumer Defense Group v. Rental Housing Industry Members* (2006) 137 Cal.App.4th 1185, 1215–1219 [40 Cal.Rptr.3d 832] [referring to attorneys engaged in a "shakedown" through bringing and settling frivolous lawsuits under that act]) and the unfair competition law (Bus. & Prof. Code, § 17200). (See *People ex rel. Lockyer v. Brar* (2004) 115 Cal.App.4th 1315, 1316–1317

Although we share to some degree the concerns voiced by the trial court and the appellate court below and by defendant and its amici curiae regarding the potential for abusive litigation being brought under the Act, these concerns do not supply a justification for our inserting additional elements of proof into the cause of action defined by the statute. It is for the Legislature (or the People through the initiative process) to determine whether to alter the statutory elements of proof to afford business establishments protection against abusive private legal actions and settlement tactics. It is for the Legislature, too, to consider whether limitations on the current statutory private cause of action might unduly weaken enforcement of the Act or place unwarranted barriers in the way of those persons who suffer discrimination and whose interests were intended to be served by the Act.

 A question was raised at oral argument regarding the extent of the damages that could accrue for repeated unannounced visits by a male person to an establishment offering discounts to women. A hypothetical case involving daily visits for a period of a year was invoked. Without purporting to answer this question concerning the speculative damages suffered in such a context, there may be equitable considerations. Although equitable principles may not be applied in opposition to statutory enactments or to defeat public policy established by the Legislature (13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 3, p. 285; see *McKennon v. Nashville Banner Publishing Co.* (1995) 513 U.S. 352, 360–362 [130 L.Ed.2d 852, 115 S.Ct. 879]), such principles have been applied to reduce ordinary tort damages imposed for violation of antidiscrimination laws. (*McKennon, supra,* 513 U.S. at pp. 360–362 ["unclean hands" doctrine may reduce damages awarded a wrongfully discharged employee]; *State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1042–1046 [6 Cal.Rptr.3d 441, 79 P.3d 556] ["avoidable consequences" doctrine may reduce damages awarded an employee subjected to sexual harassment]; see also *Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 996–997 [4 Cal.Rptr.2d 837, 824 P.2d 643] [equitable considerations barred assessment of certain statutory penalties for the employer's failure to pay prevailing wages].)

---

[9 Cal.Rptr.3d 844] [discussing the Attorney General's effort to prevent the defendant from engaging in a "shakedown" through the filing of frivolous lawsuits over "ridiculously minor violations" of the unfair competition law].)

We note as well that in 2004 the California electorate enacted legislation restricting previously broad standing requirements for a private right of action under the state unfair competition and false advertising laws (Bus. & Prof. Code, §§ 17200 et seq., 17500 et seq.), stating in the preamble to the measure that the broader standard had encouraged frivolous litigation, had been abused by attorneys who were motivated only by private financial gain, and negatively had affected many businesses. (See Prop. 64, § 1, subds. (b), (c) & (e), as enacted at Gen. Elec. (Nov. 2, 2004) [see Bus. & Prof. Code, § 17204, amended by Prop. 64 to limit standing to "any person who has suffered injury in fact and has lost money or property as a result of . . . unfair competition"].)

In addition, there are constitutional constraints on the accrual of statutory penalties. (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728–731 [36 Cal.Rptr.3d 814, 124 P.3d 408] [triable issues remained whether due process principles or the constitutional prohibition against excessive fines should reduce an accrued fine of $14,826,200 for ongoing violation of a statute governing distribution of cigarettes]; *Hale v. Morgan* (1978) 22 Cal.3d 388 [149 Cal.Rptr. 375, 584 P.2d 512] [same constitutional provisions limited accrual of a $100 per day statutory penalty that was payable to a tenant whose landlord shut off his utilities].)

The advisability and propriety of the foregoing legislative and judicial responses to perceived instances of litigation abuse are not presently before us, nor is our task now to review defendant's potential equitable defenses or to examine any constitutional limitations on damage awards that are based upon violation of a statute. The issue raised in defendant's motion for judgment on the pleadings and reached by the trial court was a limited one. The question, in the words of the trial court, was whether, in order to state a cause of action for violation of the Act, plaintiffs were required to express their "wish to be charged the same price as women on Ladies' Day." Although defendant supported its interpretation of the statute with an equitable argument that plaintiffs intentionally sought unequal treatment in order to create a cause of action and collect damages and attorney fees for each visit (and in passing mentioned this point again in its brief in the Court of Appeal), the claim was not developed as an independent basis for judgment, nor did the trial court or the Court of Appeal consider the applicability of specific equitable defenses. Our undertaking has been to determine whether plaintiffs adequately alleged a cause of action under the Act. On that point, we have concluded that existing law does not support the restriction that the Court of Appeal placed upon the statutory private right of action established by section 52(a). We make plain, however, that nothing we have said in this opinion should be interpreted as a restriction on potential equitable or constitutional defenses with respect to any damages that may be sought pursuant to section 52(a).

IV

For the foregoing reasons, the judgment of the Court of Appeal is reversed and the matter is remanded to the Court of Appeal for further proceedings consistent with this opinion.

Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**WERDEGAR, J.,** Concurring.—I fully agree with the majority's analysis and conclusion. I write separately because I cannot join the majority's

conjectural discussion (*ante*, at p. 179) of equitable defenses to hypothetical claims under the Unruh Civil Rights Act (Civ. Code, § 52, subd. (a)). As the majority explains (*ante*, at p. 180), no such issue is before us. That nothing the majority says on the subject has any precedential force necessarily follows. (*People v. Mendoza* (2000) 23 Cal.4th 896, 915 [98 Cal.Rptr.2d 431, 4 P.3d 265]; *Hart v. Burnett* (1860) 15 Cal. 530, 598–599.)