*433 BAXTER, J.,
Concurring and Dissenting. — Though with some reservation, I am willing to assume, without deciding, that the majority correctly analyzes how the state law doctrine of after-acquired evidence should apply,[1] in light of Senate Bill No. 1818 (2001-2002 Reg. Sess.) (Senate Bill No. 1818), when a person claims he or she was denied employment for reasons forbidden by the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.), but the employer later discovers that, in violation of both California and federal law, the person submitted a false Social Security card and number as evidence of eligibility to work in the United States.
However, I disagree with the majority’s holding on the separate issue of federal preemption. The majority concludes that federal immigration law preempts an award to an alien employee of “lost wage damages”[2] for wrongful termination under FEHA only with respect to a period after the previously unaware employer later learns that, by virtue of the worker’s federal immigration status, he or she was and is legally ineligible for United States employment. In my view, a state law rule that allows any recovery of posttermination lost wages by an employment-ineligible alien who sought or procured the job by submitting fraudulent eligibility documents, in direct violation of federal law, is foreclosed by the United States Supreme Court’s definitive interpretation of federal immigration policy as set forth in the Immigration Reform and Control Act of 1986 (also known as IRCA; Pub.L. No. 99-603 (Nov. 6, 1986) 100 Stat. 3359).
However, the limited record before us does not allow a final application of my legal conclusions to the facts that may or may not exist in this case. Most significantly, while it seems clear plaintiff knowingly submitted a false Social Security card and number when applying for work with defendant, the summary judgment motion failed to establish whether plaintiff is, in fact, an alien ineligible under federal immigration law to be employed in the United States. Accordingly, further litigation of these matters is necessary. Moreover, even if plaintiff is an unauthorized alien who committed immigration fraud to obtain his job, he may still not be preempted from pursuing nonwage remedies for defendant’s wrongful conduct, if any, under FEHA. I therefore agree with the majority that defendant’s motion for summary judgment should not have been granted. I explain my conclusions below.
*434 As the majority indicates, in April 2003, plaintiff obtained seasonal employment with defendant by submitting, as evidence of his eligibility to work in the United States, an alien registration card and a Social Security card, both bearing his name. Under penalty of perjury, plaintiff signed Immigration and Naturalization form 1-9, on which he entered the number shown on the Social Security card. He also signed Internal Revenue Service form W-4, which included the same Social Security number. Each time he was recalled to work, he used this Social Security number on new 1-9 and W-4 forms he signed. No later than early 2005, a letter from the Social Security Administration advised him that his name and Social Security number did not match the agency’s records.
In 2006, plaintiff hurt his back while on the job for defendant. Thereafter, defendant failed to recall him for the 2007 season. He sued defendant, alleging that, in violation of FEHA, defendant had refused to rehire him in retaliation for his filing of a worker’s compensation claim, and to avoid accommodating his physical disability. Plaintiff sought various forms of monetary recovery, including lost wages.
In the course of pretrial motions, plaintiff acknowledged that it is a state and federal felony, when applying for employment, to use false identification documents to conceal one’s true citizenship or resident alien status (18 U.S.C. § 1546(b)(2); Pen. Code, § 114). He stated he intended to testify at trial, and would assert his privilege against compelled self-incrimination if asked about his immigration status. This led defendant to investigate the authenticity of the documents plaintiff had submitted to obtain the job.
Defendant subsequently moved for summary judgment, invoking the doctrines of after-acquired evidence and unclean hands. Defendant asserted that its discovery of plaintiff’s fraudulent use of another person’s Social Security number entitled it to dismissal of plaintiff’s suit as a matter of law.
In support of the motion, defendant submitted evidence that the Social Security number provided by plaintiff belonged to Kelly R. Tenney, a North Carolina resident, who stated that he did not know plaintiff and had given no one permission to use the number. Defendant also submitted the declaration of its president, stating that the company had a long-standing policy of refusing to hire persons who are not legally authorized to work in the United States, and would immediately discharge any employee upon discovering the worker had provided false documents or information to establish such eligibility.
In response, plaintiff posited, but proffered no evidence, that the Social Security number he had provided might mistakenly have been assigned to *435 both him and Tenney. Plaintiff did not state that the Social Security card and number were his, or that he believed they were. He made no claims about the authenticity of the alien registration card he had also submitted, and he neither admitted nor denied he was an alien ineligible for United States employment. However, he declared, among other things, that several of his coworkers had received the same Social Security Administration notice he received, and that defendant’s production manager, Leo Huizar, assured the group they need not worry about discrepancies in Social Security numbers so long as defendant was satisfied with their work. Plaintiff also stated that, during his years in defendant’s employ, he “personally knew several immigrants” also working there, “some of whom admitted to being undocumented workers.” According to plaintiff, he “never heard of [defendant] discharging any person due to a discrepancy with a Social Security number, or for any other immigration-related issue.”
The trial court initially denied the motion, finding there were triable issues whether (1) plaintiff had fraudulently submitted the Social Security number, or instead whether the same number had mistakenly been issued to two different people; (2) plaintiff was eligible for United States employment based upon his submission of a valid alien registration card; and (3) plaintiff had apprised defendant of the discrepancy notice he received from the Social Security Administration, and if so, whether defendant had acted on this information, or instead had ignored it.
Defendant sought mandamus, and the Court of Appeal issued an alternative writ. In response, the trial court withdrew its order denying the motion for summary judgment, granted the motion, and dismissed the action.
The Court of Appeal affirmed. It reasoned that the after-acquired evidence and unclean hands doctrines provided a complete defense to the employer’s liability for an allegedly wrongful discharge under FEHA.
The Court of Appeal conceded there was no evidence plaintiff had failed to provide a valid alien registration card (a photo identification document which, if valid, suffices to establish both identity and employment eligibility for immigration law purposes).[3] However, the appellate court deemed it undisputed that plaintiff had furnished a false Social Security card and number — an act, the Court of Appeal noted, that (1) was a criminal violation of the federal immigration law, (2) misrepresented a job qualification imposed by the federal government (the possession of a valid personal Social Security number), and (3) exposed defendant to civil and criminal penalties for violation of its obligations under the immigration and tax laws to report its *436 employees’ correct Social Security numbers. Because plaintiff’s wrongdoing independently justified a refusal to employ him, and would have caused defendant to take this step had it known the true facts, the Court of Appeal concluded he should have no recourse for a failure to rehire that stemmed from other, allegedly forbidden, motives.
The Court of Appeal also dismissed plaintiff’s claim he had demonstrated the triability of defendant’s policies toward employees and applicants who submitted false documents. The court reasoned that the declaration of defendant’s president, to the effect that the company would refuse to hire applicants who were undocumented, or who provided false numbers, was not directly contradicted by Huizar’s alleged statement that defendant would overlook discrepancies in Social Security numbers, or by plaintiff’s declaration that other employees of defendant admitted they were undocumented aliens, and that plaintiff had never heard of any worker being terminated over Social Security or immigration issues.
Finally, the Court of Appeal ruled that application of the after-acquired evidence and unclean hands doctrines to bar plaintiff’s recovery was not precluded by Senate Bill No. 1818. This bill inserted, at several places in the codified statutes, a declaration that all worker and employee protections, rights, and remedies provided by California law, “except any reinstatement remedy prohibited by federal law,” are available to individuals “regardless of immigration status.” (Stats. 2002, ch. 1071, §§ 1-4, pp. 6914-6915.) The Court of Appeal noted that Senate Bill No. 1818 stated it was “declaratory of existing law,” and cannot have been intended to immunize undocumented aliens from employer defenses that would apply against all other workers. At the time Senate Bill No. 1818 was enacted, the Court of Appeal asserted, existing case law barred an employee from recovering lost wages for wrongful termination if, as here, he was not legally qualified for the job, was not eligible for reinstatement, or would not have been reinstated in the exercise of legitimate employer prerogatives.
The majority finds this analysis unpersuasive, and would reverse the Court of Appeal. In the majority’s view, triable issues remain about whether plaintiff’s submission of the false Social Security card and number, if known by defendant, would have caused defendant to terminate plaintiff’s employment.
Further, the majority posits, even if defendant would have declined, on this legitimate ground, to hire or retain plaintiff, the after-acquired evidence and unclean hands doctrines generally cannot serve as complete bars to a wrongdoing worker’s recovery, under FEHA, when the employer’s actual motive was forbidden by the statute. Except in the most egregious cases of
*437 employee wrongdoing, the majority concludes, state law makes an employer who terminated a worker for reasons prohibited by FEHA liable to the worker for lost wages attributable to any posttermination period before the employer later discovered legitimate grounds for its action. (See, e.g., McKennon v. Nashville Banner Publishing Co. (1995) 513 U.S. 352, 360-363 [130 L.Ed.2d 852, 115 S.Ct. 879] [in suit alleging wrongful termination in violation of federal Age Discrimination in Employment Act of 1967 (29 U.S.C. § 621 et seq.), employer’s posttermination discovery that, while still working, employee had violated company policy by copying and removing confidential documents did not preclude employee’s right to recover lost wages for period before employer learned of this independent ground for termination].)[4]
The majority further concludes that Senate Bill No. 1818’s reference to “existing law” was not intended to endorse, in the immigration context, a broad reading of certain prior cases suggesting that under the after-acquired evidence and unclean hands doctrines, an employee’s wrongdoing which would have caused his or her legitimate termination bars a claim of wrongful termination. Observing that the legislative history of Senate Bill No. 1818 does not mention these prior decisions, the majority suggests that the more likely purpose of the “existing law” language was to extend to then-pending *438 cases the bill’s “central directive” that full state law employment protections should apply to all employees “ ‘regardless of immigration status.’ ” (Maj. opn., ante, at p. 428.)
But before discussing these state law issues, the majority addresses a “threshold” issue not litigated below — whether a federal immigration statute, IRCA, either completely or partially preempts Senate Bill No. 1818’s mandate that all California labor and employment rights and remedies, including those afforded by FEHA, are fully applicable to workers “who are unauthorized aliens.” (Maj. opn., ante, at p. 418, fn. omitted.) The majority concludes that IRCA does preclude an unauthorized alien who was wrongfully terminated in violation of FEHA from recovering lost wages for any period after the employer subsequently discovered the alien was ineligible for employment under federal immigration law, but does not bar such a recovery for the period before the employer learned of the alien’s ineligibility.
I have doubts about the majority’s analysis of state law — in particular, I question the majority’s construction of the “existing law” proviso in Senate Bill No. 1818. However, I decline to draw a final conclusion on that issue at the current stage of this procedurally tangled case, because I am persuaded that the supremacy of federal immigration law may ultimately obviate the recovery the majority would allow. If further litigation proves plaintiff actually is an unauthorized alien who submitted false documentation to prove otherwise, I believe, contrary to the majority, that federal immigration policy will foreclose any recovery by plaintiff of posttermination lost wages under California law. This result, I conclude, is dictated by definitive United States Supreme Court authority.
As the majority acknowledges, under the supremacy clause (U.S. Const., art. VI, cl. 2), federal law preempts and supersedes state law if, among other things, the state law stands as “an obstacle to accomplishing congressional objectives. [Citations.]” (Maj. opn., ante, at p. 421.) The United States Supreme Court has told us, in no uncertain terms, that the award of posttermination lost wage damages to an unauthorized alien worker who procured the job by committing criminal immigration fraud presents just such an unacceptable obstacle.
In Hoffman Plastic Compounds, Inc. v. NLRB (2002) 535 U.S. 137 [152 L.Ed.2d 271, 122 S.Ct. 1275] (Hoffman), the National Labor Relations Board (NLRB or Board) found that, in 1992, Hoffman Plastic Compounds, Inc. (Hoffman), a custom formulator of industrial and pharmaceutical chemical products, had committed an unfair labor practice under the National Labor Relations Act (NLRA; 29 U.S.C. § 151 et seq.) by terminating Jose Castro and several other workers in retaliation for their union organizing activities. *439 As remedies, the Board ordered Hoffman, among other things, to offer reinstatement and backpay (i.e., posttermination lost wages) to the affected employees.
At a subsequent compliance hearing, Castro disclosed that he was an alien who had never been authorized to work in the United States. Castro further indicated that he had gained employment with Hoffman by proffering a birth certificate belonging to a Texas-bom friend, and that he had also used this certificate to fraudulently obtain a Social Security card. Based on this evidence, the administrative law judge (ALJ) found that the Board was precluded from awarding reinstatement or backpay to Castro.
Several years later, the Board reversed the ALJ on the issue of Castro’s backpay. The Board concluded that “ ‘the most effective way to accommodate and further the immigration policies embodied in [IRCA] is to provide the protections and remedies of the [NLRA] to undocumented workers in the same manner as to other employees.’ [Citation.]” (Hoffman, supra, 535 U.S. at p. 141.) Accordingly, the Board ruled that Castro was entitled to some $67,000 in backpay, plus interest on that principal amount. The court of appeals enforced the Board’s order.
The United States Supreme Court reversed. At the outset, the majority noted that the NLRB’s authority to remedy unfair labor practices, though broad, is not unlimited where “the Board’s remedial preferences . . . potentially trench upon federal statutes and policies unrelated to the NLRA.” (Hoffman, supra, 535 U.S. at p. 144.)
The Hoffman majority explained that, in Sure-Tan, Inc. v. NLRB (1984) 467 U.S. 883 [81 L.Ed.2d 732, 104 S.Ct. 2803]- — at a time when federal immigration law did not expressly prohibit unauthorized aliens from working or being hired while present in this country, and was only “ ‘ “peripherally]” ’ ” concerned with their employment here — the court had nonetheless precluded the NLRB from unconditionally ordering reinstatement of undocumented alien employees who had since voluntarily left the country. (Hoffman, supra, 535 U.S. at p. 144.) So as to not “effectively [reward] a violation of the immigration laws by reinstating workers not authorized to reenter the United States” (id. at p. 145), Sure-Tan had required that an award of reinstatement in such cases be conditioned on proof of the workers’ legal reentry. Moreover, the court had reasoned in Sure-Tan, these employees “ ‘must be deemed “unavailable” ’ ” for work, and backpay could thus not be awarded, with respect to any period in which such persons “ ‘were not lawfully entitled to be present and employed in the United States.’ ” (Hoffman, supra, at p. 145.)
In Hoffman, the Board argued that the Sure-Tan limitations applied only to undocumented aliens who had left the United States and thus could not claim *440 reinstatement or backpay without legal reentry. But whatever isolated passages in Sure-Tan might support that conclusion, the Hoffinan majority observed, “the question presented here [is] better analyzed through a wider lens, focused as it must be on a legal landscape now significantly changed.” (Hoffman, supra, 535 U.S. at p. 147.) Whether or not, at the time of Sure-Tan, the Board might be required to yield “where . . . [its] chosen remedy trenches upon a federal statute or policy outside [that agency’s] competence to administer,” said the Hoffinan majority, “[such] is precisely the situation today.” (Hoffman, supra, at p. 147.)
As the Hoffinan majority recounted, “two years after Sure-Tan, Congress [had] enacted IRCA, a comprehensive [immigration reform] scheme [that] prohibits] the employment of illegal aliens . . .” and “ ‘forcefully’ [makes] combating [such] employment . . . central to ‘[t]he policy of immigration law.’ [Citation.]” (Hoffman, supra, 535 U.S. at p. 147.) “[Critical” to enforcement of the prohibition, the court noted, is an “extensive ‘. . . verification system’ . . . designed to deny employment to aliens” not legally present or “authorized to work” in this country. (Ibid., citation omitted.) Under this system, an employer must verify the identity and eligibility of all potential new hires by examining specified documentation. An employer that hires an alien applicant who is unable to present such documentation, or otherwise knowingly employs an ineligible alien, is subject to civil and criminal penalties.
To ensure the effective confirmation of an applicant’s authorization to work in this country, the Hoffinan majority pointed out, IRCA “makes it a crime for an unauthorized alien to subvert [this] verification system by tendering fraudulent documents. [Citation.]” (Hoffman, supra, 535 U.S. at p. 148.) “[The statute] thus prohibits aliens from using or attempting to use ‘any forged, counterfeit, altered, or falsely made document’ or ‘any document lawfully issued to or with respect to a person other than the possessor’ for purposes of obtaining employment in the United States. [Citation.] Aliens who use or attempt to use such documents are subject to fines and criminal prosecution. [Citation.]” (Ibid.)
“Under the IRCA regime,” the Hoffinan majority explained, “it is impossible for an undocumented alien to obtain employment in the United States without some party directly contravening explicit congressional policies. Either the undocumented alien tenders fraudulent identification, which subverts the cornerstone of IRCA’s enforcement mechanism, or the employer knowingly hires the undocumented alien in direct contradiction of its IRCA obligations. The Board asks that we overlook this fact and allow it to award backpay to an illegal alien for years of work not performed, for wages that could not lawfully have been earned, and for a job obtained in the first *441 instance by a criminal fraud. We find, however, that awarding backpay to illegal aliens runs counter to policies underlying IRCA, policies the Board has no authority to enforce or administer. Therefore, as we have consistently held in like circumstances, the award lies beyond the bounds of the Board’s remedial discretion.” (Hoffman, supra, 535 U.S. at pp. 148-149, italics added.)
The Board urged that a limited backpay award — one confined to the period before the employer learned of Castro’s illegal status — would reasonably accommodate IRCA, because during the prediscovery period, the employer would not have violated IRCA by retaining Castro in its employ, and because IRCA does not expressly prohibit the recovery of backpay by illegal aliens who misused documents to procure their jobs. The Hoffman majority rejected this argument. “What matters here,” the majority declared, “and what sinks both of the Board’s claims, is that Congress has expressly made it criminally punishable for an alien to obtain employment with false documents. There is no reason to think that Congress nonetheless intended to permit backpay where but for an employer’s unfair labor practices, an alien-employee would have remained in the United States illegally, and continued to work illegally, all the while successfully evading . . . immigration authorities. Far from ‘accommodating’ IRCA, the Board’s position, recognizing employer misconduct but discounting the misconduct of illegal alien employees, subverts it.” (Hoffman, supra, 535 U.S. at pp. 149-150, fn. omitted.) Indeed, the Hoffman majority asserted, such a backpay award “not only trivializes the immigration laws, it. . . condones and encourages future violations” by creating incentives to remain and work in this country illegally. (Id. at p. 150.)
“We therefore conclude,” the Hoffman majority declared, “that allowing the Board to award backpay to illegal aliens would unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA. It would encourage the successful evasion of apprehension by immigration authorities, condone prior violations of the immigration laws, and encourage future violations. However broad the Board’s discretion to fashion remedies when dealing only with the NLRA, it is not so unbounded as to authorize this sort of an award.” (Hoffman, supra, 535 U.S. at pp. 151-152, italics added.)
Thus, after considering the issue at length, the high court has made crystal clear that federal immigration policy, as set forth in IRCA, is critically undermined by the award of posttermination lost wages to an alien who is not legally present or authorized to work in this country, and who committed criminal immigration fraud to obtain the job, even when the alien was wrongfully terminated in violation of another law generally intended for the protection of workers’ rights. The conclusion follows inescapably, under the *442 federal supremacy clause, that California cannot authorize such an award, for it would “ ‘stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress . . [citations].” (Arizona v. United States (2012) 567 U.S._,___ [183 L.Ed.2d 351, 132 S.Ct. 2492, 2501].)
The instant majority struggles mightily to avoid this result. In the majority’s view, we may disregard Hoffman for the purpose of preemption analysis because (1) Hoffman concerned only the interplay of two federal statutes, and said nothing about IRCA’s preemptive effect on state worker protection laws; (2) Congress has not expressly precluded all state laws concerning undocumented aliens, or so occupied the field as to dictate such preclusion; (3) there is a presumption against preemption in areas of traditional state regulation, such as the protection of workers; and (4) the NLRA, the statute at issue in Hoffman, does not rely, for enforcement, on private suits for damages to the same extent as does California’s antidiscrimination statute, FEHA.
Then, as if Hoffman did not exist, the majority reweighs the concerns that led the Hoffman majority to its ruling. Contrary to Hoffman, the instant majority concludes that a rule allowing a criminally fraudulent unauthorized alien to collect wrongful-termination lost wage damages will have but a “minimal” effect on IRCA’s policies (maj. opn., ante, at pp. 425-426), while failing to allow such a recovery against an employer who wronged the worker under another statute would “frustrate rather than advance the policies underlying federal immigration law” (id. at p. 426). In effect, the majority rejects the highest federal tribunal’s assessment of what would unacceptably undermine Congress’s immigration purposes and priorities, in favor of its own views on that subject.
None of this is persuasive. Whatever distinctions exist between the NLRA and FEHA, and between tension among federal policies on the one hand, and competing state and federal policies on the other, any such differences are insignificant for purposes of the issue before us. The United States Supreme Court — the final judicial authority on the meaning and scope of federal statutory law — has told us of a particular situation in which a legislative policy of worker protection must yield to the overriding aims of the federal immigration statutes. It has said specifically that awarding posttermination pay to an illegal alien for “work not performed, for wages that could not lawfully have been earned, and for a job obtained in the first instance by a criminal fraud” (Hoffman, supra, 535 U.S. at p. 149) “runs counter to policies underlying IRCA” (ibid.) and “would . . . trench upon explicit statutory prohibitions critical to federal immigration policy” (id. at p. 151).
These are declarations strong and clear enough to prevail over California’s expression of its sovereign right and intention to protect unauthorized alien *443 workers, and over any presumption against federal preemption of such a purpose. The high court’s statements signal that any such award stands as an obstacle to the full accomplishment of Congress’s aims, and is thus preempted. Even if the instant majority finds Hoffman's analysis unconvincing, it is not the majority’s place to reject that analysis.
Thus, just as in Hoffman, IRCA’s policies were beyond the NLRB’s “authority to enforce and administer” (Hoffman, supra, 535 U.S. at p. 149), so too are those policies beyond the administration and enforcement authority of this state and its laws. And just as the NLRB’s authority, however broad, “to fashion remedies when dealing only with the NLRA” did not extend to an award that trenched upon an immigration statute beyond the Board’s jurisdiction (id. at pp. 151-152), so too, this state’s undoubted authority to fashion remedies for violations of FEHA, when that statute is considered in isolation, does not extend to awards that would have, as the high court has concluded, a deleterious effect on a federal immigration statute beyond California’s jurisdiction.[5]
I therefore find it manifest that California cannot award, as a remedy for wrongful termination under FEHA, lost wage damages to an alien who is unauthorized to work in this country, and who obtained the job at issue by submitting fraudulent eligibility documentation in direct criminal violation of federal immigration law. California cannot dictate otherwise through the adoption of a statute such as Senate Bill No. 1818. Thus, if further litigation establishes that this is plaintiff’s situation, I believe his recovery of such lost wages attributable to any period after he was terminated from his employment will be preempted and barred.[6]
*444 I stress the narrow scope of my conclusions. I go no further than the high court did in Hoffman. I do not suggest, for example, that California is federally barred from enforcing the right of an unauthorized alien worker, even one who obtained the job by fraud, to recover unpaid wages for work actually performed, or from extending to unauthorized aliens, even those who misrepresented their immigration status, the remedies it affords to workers who were injured or wronged while performing the work they were hired to do. Hoffman did not address those situations, and logical distinctions between those cases, and the one at issue here, come easily to mind. Hoffman concluded that federal immigration policy is undermined when an alien who is unauthorized for employment, and who obtained it by criminal means, seeks unearned wages for being terminated from the job he or she was never entitled to have, and for work he or she thus did not perform. It is reasonable to conclude that such a claim, if honored, more directly and unjustifiably rewards the alien’s unauthorized and fraudulently procured employment, contrary to IRCA’s aims, than does a claim based on fair and just compensation under state law for injury sustained on the job itself.[7]
*445 Nor do I foreclose the possibility that a criminally fraudulent unauthorized alien worker who was wrongfully terminated in violation of FEHA may nonetheless be able to pursue other remedies available under this statute. Such remedies might include injunctive relief, costs and attorney fees, and even exemplary damages intended not as compensation to the worker for loss of the job, but purely as a sanction against an employer whose malice is established. These, too, are issues not addressed in Hoffman, and they do not as directly implicate the high court’s concern that such a worker not be allowed to recover posttermination earnings for a job to which he or she was never entitled.[8]
As I have indicated above, it appears clear from the instant record that plaintiff used a false Social Security card and number to obtain employment with defendant, but the evidence on summary judgment does not establish whether plaintiff is actually an alien unauthorized to work in the United States. Because application of the preemption rule I derive from Hoffman depends on a determination of that issue, and because plaintiff’s immigration status may not necessarily bar him from pursuing a FEHA claim in some form, I concur in the reversal of the summary judgment for defendant.
Chin, J., concurred.

 However, I have some reservations about the majority’s discussion of the unclean hands doctrine. (See post, at p. 437, fn. 4.)

 Like the majority, when I use the terms “lost wages” or “lost wage damages,” sometimes also confusingly referred to as “backpay” or “frontpay,” I mean wages attributable to a period after the employer has discharged or declined to hire or rehire the individual, during which time the person did not actually perform work for the employer, and awarded on the premise that he or she would have been working but for the employer’s wrongful act.

 See 8 United States Code section 1324a(b)(l)(B)(ii).)

 However, to the extent the majority implies that the unclean hands doctrine might serve to reduce, but not eliminate, the damages due a worker wrongfully discharged under FEHA whose own later-discovered wrongdoing would have provided legitimate grounds for termination, the majority errs. It is axiomatic that, where applicable, the unclean hands doctrine serves as a complete defense to employment-based claims. (Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2013) I 16:616, p. 16-94.6 (rev. # 1, 2013) (Employment Litigation); see, e.g., Fladeboe v. American Isuzu Motors, Inc. (2007) 150 Cal.App.4th 42, 56 [58 Cal.Rptr.3d 225] [“Unclean hands applies when it would be inequitable to provide the plaintiff any relief, and provides a complete defense to both legal and equitable causes of action.”].)
Thus, if equitable considerations “such as unclean hands” (maj. opn., ante, at p. 432) cannot completely bar a claim based on statute or important public policy (see McKennon v. Nashville Banner Publishing Co., supra, 513 U.S. at p. 360; Angelucci v. Century Supper Club (2007) 41 Cal.4th 160, 179 [59 Cal.Rptr.3d 142, 158 P.3d 718]), the unclean hands doctrine is inapplicable in such circumstances. Our suggestion in Angelucci that unclean hands may sometimes reduce the damages awarded to an employee wrongfully discharged under an antidiscrimination statute (Angelucci, supra, at p. 179) appears to have been an imprecise reading of McKennon, McKennon actually rejected the defense of unclean hands under the statute at issue there (McKennon, supra, at p. 360). However, as McKennon also made clear, after-acquired evidence of an employer’s legitimate grounds for discharging an employee may nonetheless be considered when fashioning a remedy for unlawful termination in order to “take due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee’s wrongdoing.” {Id. at p. 361; see Employment Litigation, supra, H 16:616 to 16:617, p. 16-94.6 (rev. # 1, 2013) [though unclean hands can only be a complete defense to wrongful termination, employee misconduct short of unclean hands may still be a complete or partial defense under after-acquired evidence doctrine].)

 Of course, the NLRA, the statute at issue in Hoffman, contains no express provision, similar to that in Senate Bill No. 1818, that its protections extend fully to workers “regardless of immigration status.” If the NLRA did include such a declaration of Congress’s purpose, it might well have been held to prevail over the more general immigration principles the high court discerned in IRCA. But this does not mean California can effectively enact a statute that trumps those federal principles.

 The majority in Hoffman squarely held that even if the employer’s motives for terminating an employee were wrongful under a law unrelated to the worker’s immigration status, a remedial award of lost wages for work not performed, to an unauthorized alien who obtained the employment by submitting fraudulent documentation in criminal violation of IRCA, and was never entitled to the job in the first place, unacceptably undermines the policies underlying this federal law. It does appear that in Hoffman, the employer was not aware of the employee’s fraud and unauthorized alien status until after it fired him for union activity in violation of the NLRA. (Hoffman, supra, 535 U.S. at p. 141; see id. at p. 155 (dis. opn. of Breyer, J.).) But the Hoffman majority gave no dispositive effect in its analysis to the employer’s compliance or noncompliance with IRCA, even though the dissent specifically urged the relevance of this factor (Hoffman, supra, at pp. 155-156 (dis. opn. of Breyer, J.)). I therefore do not read the rule of Hoffman to apply only to IRCA-compliant employers, though some post-Hoffman decisions in other jurisdictions have inferred such a corollary. (See fn. 7, post.) Employers who *444 illegally hire unauthorized aliens are, of course, subject to substantial penalties under IRCA itself. (See 8 U.S.C. § 1324a(e)(4)(A)(i)-(iii), (5).)

 The most pertinent post-Hoffman out-of-state decision disclosed by my research is in general accord with my conclusion. In Crespo v. Evergo Corp. (2004) 366 N.J. Super. 391 [841 A.2d 471], the court held that, under Hoffman, an unauthorized alien worker who submitted fraudulent documentation to an unaware employer to obtain the job, and then, in violation of a state antidiscrimination law, was terminated after taking maternity leave, could not recover lost wage or other monetary damages arising from the wrongful termination. (Crespo, supra, at pp. 473-476.) Crespo limited its holding to recovery specifically sought as damages for loss of a position to which the alien was never entitled, and left open the possibility that IRCA would permit an unauthorized alien worker’s monetary recovery under state law for employment-related physical injury or other wrongs he or she suffered while on the job. (See Crespo, at pp. 475-476.) Post-Hoffinan cases from other jurisdictions have reached varying conclusions as to whether the rationale of Hoffman completely or partially bars unauthorized alien workers from compensation for employer safety violations, workplace injuries, or other tortious harm affecting a worker’s earning capacity. (See, e.g., Madeira v. Affordable Housing Foundation, Inc. (2d Cir. 2006) 469 F.3d 219, 231-232 [where employer, not undocumented alien worker, was in violation of IRCA, and jury was instructed to consider alien’s deportability, federal immigration law did not absolutely bar worker injured in worksite accident from recovering tort-based future earnings damages at United States rates]; Majlinger v. Cassino Contracting Corp. (N.Y.App.Div. 2005) 25 A.D.Sd 14 [802 N.Y.S.2d 56, 61-64] [IRCA did not bar subcontractor’s undocumented alien employee from recovering against employer, contractor, or site owner for workplace injury], but see id. at p. 66 [noting plausible distinction between wrongful termination case, where “employer unwittingly had a valid reason for taking precisely the action it took . . . ,” and case of workplace injury, where employer had no right whatsoever to withhold safety devices required by state law]; Correa v. Waymouth Farms, Inc. (Minn. 2003) 664 N.W.2d 324, 329 [IRCA did not preempt states’ rights to award worker’s compensation benefits]; compare with, e.g., Wielgus v. Ryobi Technologies, Inc. (N.D.Ill. 2012) 875 F.Supp.2d 854, 862-864 [predicting 111. Supreme Court would conclude, under Hoffman, that undocumented alien injured in workplace accident by allegedly defective product may recover damages for lost earning capacity only at rates applicable to country of origin, not at *445 United States rates]; Veliz v. Rental Service Corp. USA, Inc. (M.D.Fla. 2003) 313 F.Supp.2d 1317, 1335-1336 [under Hoffman, lost United States wages could not be recovered in tort on behalf of unauthorized alien who, having procured employment by submitting fraudulent papers, was tilled in workplace forklift accident]; Rosa v. Partners in Progress, Inc. (2005) 152 N.H. 6 [868 A.2d 994, 998-1002] [unauthorized alien who committed fraud to obtain employment generally may recover tort-based earning capacity damages for workplace injury only at rates applicable to country of origin, since United States earnings would have continued only by virtue of illegal employment, but employer who hired alien in violation of IRCA’s knowledge or verification requirements cannot bar alien’s recovery at United States rates].)

 In addition to a claim for lost wages, plaintiff’s amended complaint also includes a prayer for exemplary damages, “general damages,” and “such other and further relief as is just.”