Filed 3/3/22; Modified and certified for partial publication 4/1/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ADRIANA J. QUINTERO,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　v.<br><br>STEVEN A. WEINKAUF,<br><br>　　　Defendant and Appellant. | A159812, A162688<br><br>(San Mateo County<br>Super. Ct. No. 18-CIV-05383) |

Plaintiff Adriana J. Quintero sued defendant Steven A. Weinkauf for stalking, assault, intentional infliction of emotional distress (IIED), and domestic violence. The jury found in favor of Quintero on her stalking, IIED, and domestic violence claims, awarding her compensatory and punitive damages. Judgment was entered in Quintero's favor for $1.3 million. The trial court then awarded Quintero approximately $850,000 in attorney fees and $60,000 in costs. A supplemental judgment was entered in Quintero's favor for a total of $2.2 million.

In this consolidated appeal, Weinkauf claims that reversal of the judgment is required due to numerous evidentiary, instructional, and other errors. He also claims that reversal of the judgment requires reversal of the supplemental judgment, as Quintero would no longer be the prevailing party entitled to attorney fees and costs. We affirm.

1

# I. BACKGROUND[1]

Quintero filed a lawsuit against Weinkauf asserting four causes of action: (1) the tort of stalking, (2) assault, (3) IIED, and (4) the tort of domestic violence. The complaint alleged that after Quintero and Weinkauf ended their romantic relationship, Weinkauf shot arrows and discharged a firearm through the windows of Quintero's business. It further alleged that Weinkauf committed these acts in disguise and under cover of darkness, but Quintero was ultimately able to identify him as the perpetrator. This civil action was preceded by a criminal action, in which Weinkauf pled guilty to stalking (Pen. Code, § 646.9) with an enhancement for personal use of a dangerous and deadly weapon (Pen. Code, § 12022, subd. (b)(1)) and a criminal protective order was entered. Weinkauf moved for summary judgment or adjudication on each cause of action. The motion was denied.

The trial proceeded in three phases: (1) jury trial on the issues of liability and compensatory damages, (2) bench trial on the issue of Weinkauf's net worth, and (3) jury determination on the amount of punitive damages. During the first phase, Quintero testified that she met Weinkauf when they worked together as attorneys for the Public Administrator and Public Guardian of San Francisco County, and they subsequently started a romantic relationship that ended in December 2013.

In April, June, and August 2015, crossbow arrows were shot through the windows of Quintero's law office building. Quintero then installed surveillance video cameras on the building. On January 3, 2017, there was another shooting that cracked a window of Quintero's building—this time

---

[1] The following is a brief summary of some of the factual and procedural background in this case, which we set out to provide context to the issues raised on appeal. Additional facts are included in our legal discussion.

with some other weapon. Quintero reviewed the surveillance video footage and saw someone in a red Jeep fire a gunshot. She was unable, however, to identify the individual. On January 8, 2017, there was another shooting at her building. Upon reviewing the surveillance video footage, Quintero saw the same Jeep circling her office and identified Weinkauf shooting a crossbow.

Weinkauf proceeded at trial in propria persona. He conceded that he had shot a crossbow at Quintero's building window once, but denied any involvement in the other shootings. The jury found in favor of Quintero on the stalking, IIED, and domestic violence claims and in favor of Weinkauf on the assault claim. The jury awarded Quintero $1.3 million in compensatory damages. It also found by clear and convincing evidence that Weinkauf had engaged in conduct with malice, oppression, or fraud.

In the second phase of the trial, the court determined Weinkauf's net worth to be $1.5 million. The jury returned for the third phase and awarded Quintero $6,000 in punitive damages. Judgment was entered in Quintero's favor for $1,306,000. Weinkauf moved for a new trial, claiming various evidentiary and instructional errors and challenging the compensatory damages award as excessive. The court denied the motion.

Quintero filed a memorandum of costs, as well as a motion for attorney fees under Code of Civil Procedure section 1021.4. The court awarded Quintero $869,688.79 in attorney fees and $60,565.25 in costs. A supplemental judgment was entered in Quintero's favor for a total of $2,236,254.04.

## II. DISCUSSION

### A. *No Evidentiary Error*

Weinkauf argues that the court made evidentiary errors in admitting (1) audio clips from a pretext telephone call between Quintero and Weinkauf

3

recorded by police; and (2) video clips of the surveillance footage from the January 2017 shootings. We review the court's evidentiary rulings for abuse of discretion. (*People v. Williams* (1997) 16 Cal.4th 153, 196–197.)

### 1. Pretext Telephone Recording

Weinkauf moved in limine to exclude the pretext telephone call on the grounds that he had not consented to the recording, that his right to counsel was violated because the call was recorded after his arrest in the criminal prosecution, and that his statements during the call were an attempt to negotiate a settlement with Quintero and, thus, inadmissible under Evidence Code section 1152. The court granted the motion in part, ruling that the recording could only be used for impeachment purposes and reserving other issues for determination after an Evidence Code section 402 hearing (402 hearing).

At the 402 hearing, Quintero testified that Police Detective Robert Branch asked her to come to the police station and make a pretext call to Weinkauf because crossbows had been recovered at his residence, but that police were still looking for the gun. She handed her phone to a technician, who used a machine to place the call on speaker while Detective Branch was sitting in the room. She later reviewed the recording of the call, confirming that she recognized the voices and that it included the same content from the call. The audio clips were played for the court. Detective Branch also testified that he had asked Quintero to make the call because he was concerned there was a firearm outstanding. He identified the computer system used to place the call, and that either he or his partner had burned a copy of the audio onto a DVD. The court stated that, after hearing the testimony on foundation, it would adhere to its previous ruling on the motion in limine.

At trial, Weinkauf testified on his own behalf that he had his car towed on January 2, 2017, and received a receipt for the towing and storage of the car from January 2 to January 5, 2017. He sought to have the receipt admitted into evidence. On cross-examination, counsel for Quintero asked if Weinkauf was denying that he shot a gun at the building on January 3, 2017. Weinkauf objected that the question was beyond the scope of direct. The court overruled the objection. Weinkauf refused to answer the question. Counsel for Quintero then proceeded to play five audio clips from the pretext call related to the gunshot. The receipt was later admitted into evidence.

On appeal, Weinkauf challenges the trial court's rulings that (1) the audio clips could be used for impeachment purposes; (2) there was proper foundation and authentication of the audio clips; and (3) Weinkauf's introduction of the towing receipt and related testimony allowed use of the audio clips for impeachment. We reject these arguments.

First, the trial court did not abuse its discretion in allowing the audio clips to be used for impeachment purposes. Penal Code section 632 provides that an electronic recording of a confidential communication is "not admissible in any judicial, administrative, legislative, or other proceeding" unless all parties to that communication had consented to the recording. (Pen. Code, § 632, subds. (a) & (d).) The statute, however, does not prohibit the use of such recording to *impeach* a witness making statements inconsistent with those conversations. (*Frio v. Superior Court* (1988) 203 Cal.App.3d 1480, 1496–1497; *People v. Crow* (1994) 28 Cal.App.4th 440, 452 ["Evidence of confidential conversations obtained by . . . recording in violation of [Penal Code] section 632 is generally inadmissible . . . but can be used to impeach inconsistent testimony by those seeking to exclude the evidence"].) The rationale for this exception is simple: Penal Code

5

section 632 "cannot be construed so as to confer upon a testifying witness the right to commit perjury." (*Frio*, *supra*, at p. 1497.) This rationale has been applied beyond Penal Code section 632 to reject other arguments similar to those Weinkauf raises here that the recording violated his right to counsel as a criminal defendant and that his statements during the call revealed settlement negotiations protected by Evidence Code section 1152. *Crow* explained that where a statement is obtained in violation of a criminal defendant's constitutional rights, or is made during the course of negotiations, there is a "significant" distinction between use of such statements by the prosecution in its case-in-chief, versus use "only to impeach the defendant's credibility after he had first made contrary statements on direct examination in the defense's case-in-chief." (*Crow*, *supra*, at pp. 450–451.) Use of these statements for impeachment purposes is permissible because, otherwise, such protections could be " 'perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.' " (*Id*. at p. 451.) So too here.

Second, the trial court did not abuse its discretion in determining there was sufficient foundation to authenticate the audio clips. For evidentiary purposes, a tape recording is a "writing" and must be authenticated before it can be received into evidence. (Evid. Code, §§ 250, 1401, subd. (a).) To authenticate a writing, its proponent must introduce "evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is." (Evid. Code, § 1400.) Here, Quintero testified that she recognized the voices on the audio recording and that it matched the content from the call. Moreover, Quintero and Detective Branch testified about the set up for making the call, the computer system used for the recording, and the copying of the audio to a DVD. This testimony was sufficient. (*People v.*

6

*Williams* (1997) 16 Cal.4th 635, 662 [foundation for tape recording laid when witness "testified that the tape was a record of his conversation"]; *People v. Spencer* (1963) 60 Cal.2d 64, 77–78 [testimony detailing manner in which tapes were recorded was sufficient foundation on the issue of authenticity].)

Third, the trial court did not abuse its discretion in allowing the audio clips to be used to impeach Weinkauf. Weinkauf sought to have the towing receipt admitted into evidence and testified that the receipt included payment for storage of his car during the time period when the January 3, 2017 shooting occurred. By taking the stand and seeking to admit the receipt, which contradicted surveillance video footage and related testimony identifying his car at the scene—in effect, giving himself an alibi—Weinkauf opened the door to cross-examination about whether he denied involvement in the shooting. (See *People v. Walters* (1961) 189 Cal.App.2d 334, 335–336 [evidence that clearly contradicted alibi testimony was properly admitted to impeach the witness].) When Weinkauf refused to answer the question, it was not improper to permit the playing of the audio clips related to the gunshot.

Weinkauf insists that the admission of a recording taken in violation of Penal Code section 632 violated his Fifth Amendment right to remain silent and his Sixth Amendment right to counsel. We need not address these alleged constitutional violations. Even assuming Weinkauf were correct, admission of the recorded statements for impeachment purposes was still proper. Putting to one side the fact that nothing in this civil trial had the potential to incriminate him, " '[w]hile the privilege against self-incrimination does assure an accused of the right to remain silent at his trial, it does not . . . encompass a right of an accused to lie in his own behalf at trial.' " (*People v. Macias* (1997) 16 Cal.4th 739, 749; *People v. Coleman*

(1975) 13 Cal.3d 867, 892.)  The same is true for alleged Sixth Amendment violations.  (*People v. May* (1988) 44 Cal.3d 309, 319.)

In sum, we conclude the trial court did not abuse its discretion in admitting the audio clips from the pretext telephone conversation.[2]

### 2. Surveillance Video Footage

The court held a 402 hearing on the admissibility of the surveillance video footage from the January 2017 incidents.  At the hearing, Quintero testified that she had the video cameras installed after the incidents in 2015 because she was trying to deter future damage and identify the perpetrator. She testified regarding the streets that each of the three exterior cameras captured, and that her recording system preserved video for three weeks. She testified that she had been trained on the use of the system and was the sole custodian with access to the system.  She testified that she watched the footage of the January 2017 incidents with police, provided the police with a thumb drive of the video, and later provided them access to retrieve the video directly from the machine.  The court ruled that the footage was admissible.

Police Officer Lane Matsui testified at trial that he received the footage from Quintero and reviewed it first with Quintero at her office and then again by himself at the police station.  The clips were played for the jury. Officer Matsui testified that the surveillance video showed the suspect vehicle from the January 2017 shootings was a red Jeep with paper plates, not DMV-issued plates.  He testified that he sent a police officer to Weinkauf's residence to determine whether Weinkauf had a red Jeep, and that the officer saw the vehicle there.

---

[2] Given our conclusion, we need not address Weinkauf's argument that the court committed "further error" by instructing the jury with "Statements of a Party Opponent" and "Adoptive Admissions."

8

During this testimony, a juror submitted the following questions: "When Pacifica PD verified that the defendant had a red Jeep, did his Jeep have DMV Plates? And when was that?" Officer Matsui testified that the other officer told him what the status of the license plate was on the vehicle at Weinkauf's residence. When asked what the other officer said, Weinkauf objected on hearsay grounds. The court overruled the objection, but allowed the testimony "only for the fact that the statement was made and not for the truth of the content." Officer Matsui testified that the other officer told him the vehicle had paper plates.

On appeal, Weinkauf argues that the trial court erred in (1) admitting the surveillance video footage clips without proper foundation and authentication; and (2) overruling his hearsay objection.

First, the trial court did not abuse its discretion in determining there was sufficient foundation to authenticate the video clips. Like tape recording, a video recording with imprinted data constitutes a "writing" that must be authenticated. (Evid. Code, §§ 250, 1401, subd. (a).) Here, Quintero testified that even though she did not know the specific internal mechanisms of the video system, she knew how to run it and provided details about what it captured and how it preserved footage. She also testified regarding how she provided the video footage to police. That is sufficient. (See *People v. Goldsmith* (2014) 59 Cal.4th 258, 271 [given witness testimony about operation of camera system and location of cameras, it can be reasonably inferred that the system automatically and contemporaneously recorded the images of the intersection and the data imprinted on the photographs when it was triggered].)

Without citing any authority, Weinkauf argues that this testimony was insufficient because there was no evidence on the "operating perimeters,

9

protocols and reliability of the operating recording system" and that no experts were called to opine on the foundation or authentication of the videos. As a preliminary matter, courts have rejected such a standard for admissibility. (See, e.g., *People v. Lugashi* (1988) 205 Cal.App.3d 632, 638 [declining to require testimony on acceptability and reliability of particular hardware and software, or internal maintenance and accuracy checks, as a prerequisite to admissibility of computer evidence].) Moreover, the fact that "conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility." (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 321.) Weinkauf had ample opportunity to cross-examine both Quintero and Officer Matsui on any issues regarding the accuracy or reliability of the video recordings.

Second, Weinkauf contends that Officer Matsui's testimony on the other officer's statement regarding the red Jeep was improper hearsay evidence. While the trial court admitted the testimony "not for the truth of the content," Weinkauf argues it was not relevant for any nonhearsay purpose. Even assuming the trial court abused its discretion in admitting the testimony, we conclude that any such error was harmless. (*People v. Duarte* (2000) 24 Cal.4th 603, 618–619, citing *People v. Watson* (1956) 46 Cal.2d 818, 836 [*Watson* standard applies to the erroneous admission of hearsay].) It is not "reasonably probable" that Weinkauf would have reached a more favorable result in the absence of such error (*Watson, supra*, at p. 836), given the overwhelming evidence that Weinkauf committed the shootings as alleged by Quintero. That evidence included Weinkauf's own admissions in the pretext recorded phone conversation; deposition testimony from Weinkauf's brother identifying Weinkauf in the surveillance video footage; photographs and police testimony of crossbow arrows found in Quintero's

10

window; and photographs and police testimony of the crossbow, arrows, and helmet found at Weinkauf's residence.

In sum, we conclude the trial court did not abuse its discretion in determining there was sufficient foundation for the admission of the video clips from the surveillance footage, and even assuming it was error to overrule Weinkauf's hearsay objection to Officer Matsui's statement about what another officer told him concerning the red Jeep, any such error was harmless.

## B. *No Instructional Error*

Weinkauf argues that the court made various instructional errors in (1) opening instructions; (2) closing instructions specific to the stalking cause of action; (3) closing instructions specific to the assault cause of action; (4) closing instructions specific to the IIED cause of action; and (5) other closing instructions.

We review claims of instructional error de novo. (*Ted Jacob Engineering Group, Inc. v. The Ratcliff Architects* (2010) 187 Cal.App.4th 945, 961.) "[T]here is no rule of automatic reversal or 'inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission. A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' " (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 (*Soule*).) "Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' " (*Ibid.*) "Thus, when deciding whether an error of instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Id.* at pp. 580–581.)

11

### 1. Opening Instructions

The statement of the case read to the jury included, in relevant part, that Quintero "alleges that Mr. Weinkauf shot into her offices multiple times between April 2015 and January of 2017, using a crossbow and gun. Mr. Weinkauf admits that he fired a crossbow at Ms. Quintero's offices one time and broke a window but denies that he did so multiple times. He admits following her on some occasions. He asserts that his actions are not as serious as Ms. Quintero believes, and that she's overstating the extent of her claims that are made in this case." Both parties had agreed this was a "reasonably fair statement of what the case is about that ought to be given."

The opening instructions to the jury included "Overview of Trial." The instruction stated, in relevant part: "As you heard in the Statement of the Case earlier read to you, Plaintiff Adriana Quintero alleges that Defendant Steven Weinkauf, committed the civil wrongs of Stalking, Assault, Intentional Infliction of Emotional Distress and Domestic Violence against her. With certain exceptions, Mr. Weinkauf contends Ms. Quintero is overstating the extent of her tort claims that are made in this case. Mr. Weinkauf also asserts affirmative defense."

Weinkauf argues that this overview of trial instruction was in error because it did not tell the jury that he denied the alleged acts supporting the claims. As a preliminary matter, Weinkauf's argument is flawed because he *conceded* that he committed one of these acts by shooting a crossbow into Quintero's building window. Moreover, the instruction explicitly referred to the statement of the case, which made clear that Weinkauf denied the other acts. Finally, Weinkauf repeatedly presented his defense to the jury that he shot a crossbow into Quintero's building window once, but did not commit the other shootings. For these reasons, we cannot conclude that this overview of trial instruction left the jury with a false impression of Weinkauf's defense.

### 2. Closing Instructions—Stalking

The jury instruction on stalking outlined four elements that Quintero was required to prove to establish the claim. On the first element, it instructed the jury that Weinkauf must have "engaged in a pattern of conduct the intent of which was to follow, alarm, place under surveillance, or harass Ms. Quintero." On the fourth element, it instructed the jury that Quintero "must have, on at least one occasion, clearly and definitely demanded that Steven Weinkauf cease and abate his pattern of conduct, and Mr. Weinkauf persisted in his pattern of conduct unless exigent circumstances made Ms. Quintero's communication of the demand impractical or unsafe."

Weinkauf argues that the first element in this instruction omitted the requirement from Civil Code section 1708.7, subdivision (a)(1) that a plaintiff "support his or her allegations with independent corroborating evidence" to establish the element. Even if such an omission was error, we conclude it was not prejudicial. There was ample independent corroborating evidence that Weinkauf committed the shootings. As detailed above, such evidence included Weinkauf's admissions, the surveillance footage, the identification of Weinkauf by his brother, and the recovery of the crossbow, arrows, and helmet at Weinkauf's residence. It is not probable that any error on the instruction for this element prejudicially affected the verdict. (*Soule*, *supra*, 8 Cal.4th at p. 580.)

The court also provided other instructions related to the stalking claim. First, it instructed the jury with the following definition of exigent circumstances: " 'Exigent Circumstances' means a situation that demands unusual or immediate action and that may allow people to circumvent usual procedures. 'Exigent Circumstances' may exist if a person's life or safety is threatened. [¶] 'Exigent Circumstances' has also been defined as an

13

emergency, something arising suddenly out of the current events, any event or occasional combination of circumstances calling for immediate action or remedy; a pressing necessity; sudden and unexpected happening or an unforeseen occurrence or condition." Weinkauf argues that the second sentence of this instruction was an inaccurate statement of the law. We deem the argument forfeited, as this definition was included in Weinkauf's proposed jury instructions. (*People v. Whalen* (2013) 56 Cal.4th 1, 84 [claim forfeited where defendant proposed version of instruction that was given].)

Second, the court instructed the jury that "[t]he law does not require impossible acts. Therefore, if it was impossible for Ms. Quintero to demand that Steven Weinkauf cease and abate his pattern of conduct, then she was not required to do so." It also instructed the jury that "[t]he law does not permit someone to profit from their own wrongful acts. Therefore, if the wrongful acts of Steven Weinkauf prevented Ms. Quintero from being able to demand that Mr. Weinkauf cease and abate his pattern of conduct, then she was not required to do so." Weinkauf argues that these instructions incorrectly qualified the fourth element of stalking that Quintero demand Weinkauf cease and abate his pattern of conduct. We disagree, as these instructions are consistent with the provision in Civil Code section 1708.7, subdivision (a)(3)(A) that no demand is required where exigent circumstances make communication of a demand "*impractical* or unsafe." (Italics added.) Any conduct by Weinkauf that rendered Quintero entirely unable to make a demand satisfies this "exigent circumstances" exception.

### 3. Closing Instructions—Assault

The court instructed the jury that "Steven A. Weinkauf acted intentionally if he intended to assault Adriana J. Quintero, or if he was substantially certain that the assault would result from his conduct." The court added the following modification to the instruction: "This element of

14

intent may be satisfied if the evidence shows defendant acted with a willful disregard of the plaintiff's rights."

Weinkauf argues that this modification was an incorrect statement of law as applied to Quintero's *other* claims for stalking and IIED. The plain language of the instruction, however, made clear that it pertained to the intent element of Quintero's *assault* claim. " ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." ' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 (*Ramos*).) Nothing in the record suggests that the jury conflated the standards for each cause of action or expressed any confusion. Accordingly, we reject the argument.

### 4. Closing Instructions—IIED

The jury instruction on IIED outlined four elements that Quintero was required to prove to establish the claim. On the second element, it instructed the jury that Weinkauf must have "intended to cause Ms. Quintero emotional distress." Weinkauf argues that the instruction failed to provide an alternative listed in the standard CACI No. 1600 instruction for this element that a defendant *either* intended to cause emotional distress *or* "acted with reckless disregard of the probability" that his conduct would cause emotional distress. The directions for use of CACI No. 1600, however, state that "[d]epending on the facts of the case, a plaintiff could choose one or both of the bracketed choices in element 2." Here, the record is clear that Quintero opted to proceed on her IIED claim under the theory that Weinkauf intended to cause her emotional distress by shooting crossbow arrows and a gun into her law offices. We conclude there was no error on this instruction.

15

### 5. Other Closing Instructions

Weinkauf raises five other claims of error in the closing instructions to the jury. First, the court instructed the jury: "If a party failed to explain or deny evidence against him when he could reasonably be expected to have done so, based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. [¶] It is up to you to decide the meaning and importance of the failure to explain or deny evidence against the party." When reading the instructions to the jury, the trial court continued: "And I said 'he,' but that also applies to Ms. Quintero, to her as well." Weinkauf claims that the oral statement did not correct the error to the written instruction provided to the jury, and that the error was prejudicial because Quintero "could not explain why a window was not broke or a bullet found on the occasions she claimed a gun was shot into her windows." Although the written instruction contained a technical error, we conclude that it was not prejudicial. (*People v. Wilson* (2008) 44 Cal.4th 758, 804.) The court orally instructed the jury with the correct instruction. "Although this court gives priority to the written version of an instruction when a conflict exists between the written and oral versions, the jury is not informed of this rule. It is thus possible the jury followed the oral instruction." (*Ibid.*) There was also "no indication the jury was aware of the slight difference between the written and oral versions of the instructions, as it asked no questions about this point." (*Ibid.*) The jury sent no questions to the judge asking about the conflict, and Quintero's counsel did not seek to exploit it in closing argument. In any event, as described above, there was ample evidence beyond Quintero's testimony that Weinkauf committed the January 3, 2017 gun shooting. For these reasons, it is not probable that any error on the instruction for this element prejudicially affected the verdict. (*Soule, supra,* 8 Cal.4th at p. 580.)

16

Second, the court instructed the jury on the presumption of Evidence Code section 634. It provided: "Regarding the towing receipt in this case, [a] person in possession of an order on himself for the payment of money or delivery of a thing is presumed to have paid the money or delivered the thing accordingly. [¶] This is what is called a rebuttable presumption. The effect of the presumption here is that the purported towing receipt in evidence is to be taken to require you to assume the facts recited in the receipt to be true *unless and until the plaintiff here presents evidence that you should not rely on the receipt to establish those assumed facts.*" (Italics added.) Weinkauf argues that the last phrase regarding the rebuttable presumption was a misstatement of the law. He contends the jury should have been instructed to assume facts "unless and until evidence is introduced which would support a finding of its nonexistence." (Evid. Code, § 604.) Again, we conclude it is not probable that any slight modification on the definition of "rebuttable presumption" prejudicially affected the verdict. (*Soule*, *supra*, 8 Cal.4th at p. 580.) There was ample evidence that supported a finding that Weinkauf did not have his car stored during the January 3, 2007 shooting. That evidence included surveillance footage and related testimony from Quintero and police identifying Weinkauf's vehicle at the scene of the January 2007 shootings, as well as testimony from Weinkauf that he had no receipts to show that his vehicle stayed at the towing company and underwent repairs.

Third, the court instructed the jury with "Duties of a Person That Charges For Towing or Storage, or Both." The instruction stated that such duties include the provision of an itemized invoice and defined "itemized invoice" pursuant to Vehicle Code section 22651.07 to require, among other things, the address, phone number, and carrier identification number of the person that is charging for towing and storage, as well as a description of the

17

vehicle. Weinkauf argues there was "no evidence, presumption or any reasonable or logical inference that supported the making of the instruction." We disagree. On cross-examination, Weinkauf testified that there was no address, telephone number, or business license number for the towing company and no vehicle license number on the receipt. There was sufficient evidence to support the reading of the instruction. (*People v. Romo* (1990) 220 Cal.App.3d 514, 517 ["It is equally well settled a trial court must give a requested instruction when there is sufficient evidence to support it, that is, when there is evidence from which reasonable jurors could conclude the facts underlying the instruction exist"].)

Fourth, the court instructed the jury with "Unusually Susceptible Plaintiff." The instruction directed the jury to decide the amount of money that would "reasonably and fairly" compensate Quintero for all damages caused by Weinkauf, "even if Ms. Quintero was more susceptible to injury than a normally healthy person would have been, and even if a normally healthy person would not have suffered similar injury." Weinkauf argues that this instruction on damages was in error because it was "in conflict" with the standard for the second element of the stalking claim that Quintero either reasonably feared for her safety, or suffered substantial emotional distress and the "pattern of conduct would cause a reasonable person to suffer substantial emotional distress." (Civ. Code, § 1708.7, subd. (a)(2).) We reject this argument, as the plain language of the instruction made clear that it pertained to *damages*, and the court correctly instructed the jury on the second element of the stalking claim. As explained above, we must assume the jurors were capable of correlating the instructions, and there is nothing in the record to suggest otherwise. (*Ramos*, *supra*, 163 Cal.App.4th at p. 1088.)

18

Fifth, the court instructed the jury with "Highly Probable—Clear and Convincing Proof."  It defined clear and convincing evidence and then stated: "In the Verdict Form in this case you are called upon to make a finding as to whether or not any liability that you may impose on Defendant Steven A. Weinkauf rises to the level of Fraud, Malice, or Oppression. [¶] If you reach that issue, that fact must be proved by Clear and Convincing Evidence."  Weinkauf argues that this instruction was in error because it failed to include definitions of fraud, malice, or oppression.  As a preliminary matter, we note that Weinkauf only submitted proposed jury instructions defining malice and oppression and to support his argument on appeal, Weinkauf offers no authority that the trial court was required to define these terms.  (Cf. *Fletcher v. Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376 ["oppression" and "malice" have well-established meanings, and the word "fraud" may "technically refer to a number of different legal problems" but is "a word of common usage and has a commonly accepted meaning"].)  In any event, we again reject the argument as we must assume that the jurors understood the instruction as given and there is nothing in the record to suggest any confusion about the terms.  (*Ramos*, *supra*, 163 Cal.App.4th at p. 1088.)

## C. *No Other Error*

Beyond his claims of evidentiary and instructional error, Weinkauf argues there are several other categories of error that necessitate reversal of the judgment.  We address and reject each in turn.

### 1. Modification of Protective Order

Shortly before trial, Weinkauf moved to modify the criminal protective order so that he could take Quintero's deposition.  The court denied the motion because discovery had closed.  Weinkauf argues that the court committed error because it did not "make any concession" allowing Weinkauf

19

to take Quintero's deposition. We disagree. Trial courts "have broad discretion in controlling the course of discovery and in making the various decisions necessitated by discovery proceedings." (*Obregon v. Superior Court* (1998) 67 Cal.App.4th 424, 431.) Here, Weinkauf did not seek to reopen discovery or provide any explanation for his lack of diligence in raising the issue of Quintero's deposition earlier. (See Code Civ. Proc., § 2024.) The trial court did not abuse its discretion in denying the motion.

### 2. Summary Judgment Standard

Weinkauf argues that the court improperly "shifted the burden" to him to establish exigent circumstances for stalking. To support this position, Weinkauf cites the court's summary judgment ruling that he had "not demonstrated that the undisputed facts establish that no exigent circumstance existed which would have made communication of a demand for defendant to cease and desist his pattern of conduct unsafe." There is no evidence that the court relied on this summary judgment standard at trial; to the contrary, the court correctly instructed the jury that Quintero bore the burden to prove her claims.

### 3. Motions on Evidence of Offsets

Quintero moved in limine to exclude any evidence regarding (1) Weinkauf's payment of restitution in the criminal proceedings; (2) Weinkauf's affirmative defense for money had and received offset, alleging Weinkauf had received $4,000 as payment of legal fees related to Quintero's family trust but had returned it upon her request; and (3) Weinkauf's two affirmative defenses for emotional distress offset, based on Quintero's alleged refusal to return a file of Weinkauf's minimum continuing legal education (MCLE) records and alleged access of another attorney's probate file without permission. Quintero also moved for judgment on the pleadings on this last affirmative defense. On the restitution and the

money had and received offset, the court granted the motions in limine without prejudice to the issue of allocation being tried separately by the court after the jury verdict. On the emotional distress offsets, the court granted the motion in limine related to the MCLE records and granted the motion for judgment on the pleadings (MJOP) related to the other attorney's file.

Weinkauf argues that these rulings were in error. We are not persuaded. First, Weinkauf offers no argument or authority that he was entitled to a jury trial on the offset of either the restitution ordered in the criminal proceedings or the money had and received. (Cf. *Kim v. Yi* (2006) 139 Cal.App.4th 543, 549–550 [apportionment of damages is equitable and is a special proceeding for which there is no right to jury trial].) Second, the trial court did not abuse its discretion in concluding that any minimal relevance of evidence related to Weinkauf's MCLE file would be outweighed by confusion and undue consumption of time, especially as Weinkauf did not appear to identify any problems with the State Bar created by his missing MCLE file. (Evid. Code, § 352.) Third, the trial court did not err in granting the MJOP as to Weinkauf's affirmative defense for an IIED offset related to Quintero's alleged access of another attorney's probate file. (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 166 [trial court's grant of MJOP is reviewed de novo].) Weinkauf argued that he had referred an heir finder to Quintero on that case, and Quintero's alleged conduct was "stressful" because he "could have gotten in a lot of trouble if things had come to light." But Weinkauf did not state facts sufficient to support tort liability for IIED— namely, that Quintero had engaged in extreme and outrageous conduct with the intent to cause, or reckless disregard of the probability of causing, extreme emotional distress for Weinkauf. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050–1051.)

21

### 4. Quintero's Attorneys

During the motion in limine hearing, Weinkauf objected that Quintero's two attorneys were presenting argument simultaneously. The court responded that Quintero's second counsel had only "stepped in temporarily," but instructed counsel that they would be required to elect responsibilities during the trial. On appeal, Weinkauf argues that he was denied a fair trial due to the conduct of the two attorneys. "[I]t is not enough for a party to show attorney misconduct. In order to justify a new trial, the party must demonstrate that the misconduct was prejudicial." (*Garcia v. ConMed* (2012) 204 Cal.App.4th 144, 149.) To support his claim, Weinkauf cites only to brief insertions by the second counsel during the motions in limine and to the discussion between counsel and the court to confirm particular dates or times, or to confirm they had heeded the court's direction and divided up the witnesses for trial. Weinkauf has not demonstrated prejudicial misconduct here.

### 5. Opening Statements

Before trial, the parties discussed the admissibility of the towing receipt. Counsel for Quintero requested a 402 hearing and an opportunity to investigate details related to the receipt. The court admitted the document, subject to further reconsideration "depending on the outcome of the investigation." Noting the issue would not be reached until Weinkauf's defense case and there was a jury panel available to draw, the court ordered that neither party could discuss the receipt during opening statements. Weinkauf argues that this restriction denied him a fair trial and due process. We reject the argument.

The trial court is vested with broad discretion to control opening statements and does not abuse this discretion by restricting argument during opening statements where parties have ample opportunity to argue all points

22

in the course of trial. (*People v. Clark* (1951) 104 Cal.App.2d 634, 637; *People v. Bezy* (1885) 67 Cal. 223, 224.) Here, Weinkauf presented argument during opening on his defense related to the receipt that his car "wasn't available" during one of the alleged shootings because it was "in the storage facility where my car had been towed to be worked on." Moreover, he was able to testify regarding the receipt during his defense case and the receipt was admitted into evidence. No abuse of discretion occurred here.

### 6. Witness Testimony

Weinkauf moved to continue the trial on the grounds that three witnesses had not been disclosed in discovery: John Aguirre, Glenn Daggs, and Monique Doryland. The court denied the motion. Aguirre was identified on Quintero's responses to the third set of special interrogatories propounded by Weinkauf. Daggs was identified on Quintero's responses to the form interrogatories propounded by Weinkauf. Counsel for Quintero conceded that Doryland had not been disclosed in discovery, but the parties agreed that Weinkauf would interview her before trial.

On appeal, Weinkauf argues that he was prejudiced by these "surprise witnesses" not disclosed in discovery. We disagree. Aguirre and Daggs *were* disclosed in written discovery responses, and the court remedied any potential unfair surprise from Doryland's testimony by affording Weinkauf the opportunity to interview her. (See *Caryl Richards, Inc. v. Superior Court* (1961) 188 Cal.App.2d 300, 303–304 [explaining that the trial court "has a wide discretion in granting discovery" and may impose sanctions "suitable and necessary to enable the party seeking discovery to obtain the objects of the discovery he seeks"].)

### 7. Sufficiency of Evidence

Weinkauf argues that there was no evidence at trial from which a reasonable trier of fact could find "exigent circumstances" to excuse the

23

requirement for stalking under Civil Code section 1708.7, subdivision (a)(3)(A) that Quintero have demanded Weinkauf cease and abate his pattern of conduct.

" 'We generally apply the familiar substantial evidence test when the sufficiency of the evidence is at issue on appeal.' " (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465.) In applying this test, we review the evidence in the light most favorable to the prevailing party and "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury verdict. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

As a preliminary matter, we note that Quintero presented evidence that she *did* make a demand to Weinkauf. Quintero testified that she called Weinkauf after the three shootings in 2015 to discuss a legal issue. As she had not yet identified Weinkauf as the shooter, she told him that "somebody was shooting crossbow arrows through [her] building" and that "it needed to stop." Reviewing this evidence in the light most favorable to Quintero, we conclude that the jury could have reasonably determined that Quintero had demanded Weinkauf cease and abate his pattern of conduct. (Civ. Code, § 1708.7, subd. (a)(3)(A).)

We similarly conclude there was substantial evidence supporting an alternative determination by the jury that there were "exigent circumstances" excusing the demand requirement. (Civ. Code, § 1708.7, subd. (a)(3)(A).) Photographs, surveillance video footage, and testimony showed that Weinkauf had shot both a crossbow and a gun into Quintero's

building.  Indeed, a witness familiar with "Bloodsport" arrows—the type of arrow used in the shootings—testified that he would not shoot that type of arrow at a person or at a building where people work because it could be a deadly weapon.  Given this evidence, the jury could have reasonably determined there were exigent circumstances that rendered Quintero's communication of the demand to Weinkauf "impractical or unsafe."  (Civ. Code, § 1708.7, subd. (a)(3)(A).)

### 8.  Jury Questions

Weinkauf argues that the court erred in its response to two jury questions sent during deliberations.  First, the jury asked, "With respect to these charges, can you provide a definition of 'imminent' under the definition of 'abuse' under domestic violence.  Is 'imminent' unspecified timing in future?  Or is 'imminent' immediate (e.g. right now) like I have a gun & will shoot you dead right now[?]"  The court and the parties found a definition submitted in Weinkauf's motion for summary judgment papers, researched the definition, and sent the following response to the jury:  "One requested definition of 'imminent' is 'near at hand; mediate rather than immediate; close rather than touching; impending on the point of happening; threatening; menacing; perilous.'  (Black's Law Dictionary)  The perception of imminent danger is to be viewed from the perspective of the threatened person."  After the response was sent to the jury, Weinkauf stated that he disagreed with the definition.  The trial court stated that Weinkauf had not objected to the definition at the time it was drafted and the response had already gone to the jury.  Accordingly, we deem the argument forfeited. (*People v. Loza* (2012) 207 Cal.App.4th 332, 350.)

Second, Weinkauf argues that the court also erred in responding to a jury question during deliberations in the third phase of trial.  Weinkauf represents that the only reference to the question in the record is the court's

25

minute order indicating a note was received from the jury. The record does not include the question, any associated discussion between the parties and the court, or the response sent to the jury. These omissions render the record inadequate to review Weinkauf's claim. (*Vo v. Las Virgenes Municipal Water Dist.* (2000) 79 Cal.App.4th 440, 447 [appellant has "an affirmative obligation to provide an adequate record so that we may assess whether the trial court abused its discretion"].)

## 9. Verdict Form

Weinkauf submitted a special verdict form, but the court rejected it "in favor of the shorter, more concise" general verdict form offered by Quintero. Weinkauf argues that the court erred in refusing his special verdict form. "The trial court has discretion to determine whether or not to request the jury to return special findings in addition to a general verdict, and its decision will not be reversed except upon a showing of abuse of discretion." (*Gherman v. Colburn* (1977) 72 Cal.App.3d 544, 590.) None of Weinkauf's arguments regarding the general verdict form demonstrates an abuse of discretion here. Weinkauf contends it is "impossible to ascertain" whether the jury found each element of Quintero's tort claims had been established, and whether the damages award included lost income or medical costs. The court, however, fully instructed the jury on the elements required for each tort claim. Contrary to Weinkauf's representation, the court also instructed the jury that Quintero was seeking both economic and non-economic damages, and that those economic damages included lost past earnings as well as past and future medical expenses. The court "did not abuse its discretion by not repeating those instructions as questions in the special verdict form." (*J.P. v. Carlsbad Unified School Dist.* (2014) 232 Cal.App.4th 323, 340.)

Weinkauf also contends that the verdict is "inconsistent" because the jury found in favor of Quintero on the domestic violence claim, but in favor of

26

Weinkauf on the assault claim, despite the fact that both claims require "apprehension of either immediate or imminent contact." This argument not only mischaracterizes the elements of the domestic violence claim (Pen. Code, § 13700, subd. (b) [defining "abuse" to include intentionally or recklessly causing or attempting to cause bodily injury, *or* placing another in reasonable apprehension of imminent injury]), but ignores the possibility that the jury found in favor of Weinkauf on the assault claim because it concluded Quintero had not established some other element of assault.

### 10. Second Phase of Trial

Weinkauf argues that the trial court erred in its determination of his net worth during the second phase of trial. Specifically, Weinkauf contends that the trial court (1) improperly considered the "income tax ramifications" of the compensatory damages award; (2) improperly included the value of his home and adjoining lot, which had been placed in an irrevocable trust; and (3) failed to consider capital gains taxes that would result from a sale of the properties to satisfy the judgment, and improperly instructed the jury on the issue.

First, Weinkauf does not provide any citation to the record to show that the court actually considered any "income tax ramifications," in violation of California Rules of Court, rule 8.204(a)(1)(C). Indeed, the court's calculation explicitly excluded Weinkauf's income. Nor does Weinkauf provide any authority for his argument, in violation of California Rules of Court, rule 8.204(a)(1)(B). Because the argument is not properly presented or sufficiently developed to be cognizable, we must treat it as waived. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

Second, the trial court did not err in including Weinkauf's home and lot in its net worth determination. Here, Weinkauf did not dispute that he resided in the home without paying rent, and had used the property as

27

collateral to secure his bail in the criminal proceedings. As Weinkauf retained interests in these assets, they can be reached to satisfy a judgment against him. (*Nelson v. California Trust Co.* (1949) 33 Cal.2d 501 ["It is against public policy to permit a man to tie up his property in such a way that he can enjoy it but prevent his creditors from reaching it"]; *McColgan v. Magee, Inc.* (1916) 172 Cal. 182, 186 ["[O]ne cannot by any disposition of his own property put the same or the income thereof beyond the reach of his creditors, so long as he himself retains the right to receive and use it"].) Moreover, Weinkauf did not record deeds placing these properties into the trust until shortly before the trial in this action. Even if that recording perfected the status of the deeds, it was proper to include the properties in Weinkauf's net worth under the doctrine of unclean hands. (See *McDougall v. O'Hara* (1954) 129 Cal.App.2d 12, 14 [recording of declaration of homestead month before entry of judgment did not allow party to quiet title against judgment lien because "[t]o permit him to do so would be to afford him the aid of equity to profit from his own misconduct"].)

Third, Weinkauf offers no authority for his argument that the trial court was required to consider the *possibility* of future capital gains taxes from a sale of Weinkauf's residence. As the trial court observed, "there would be no capital gain recognition on any resale if it was reinvested in another primary residence, but we don't know what would happen with that, whether it would be reinvested in that way." A determination of net worth cannot be based on speculation. (*Adams v. Murakami* (1991) 54 Cal.3d 105, 114; see *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 620–622.) Weinkauf similarly offers no authority for his argument that the trial court erred in instructing the jury that "if you were to sell your primary residence, that you have 18 months—if you buy another primary residence with those proceeds,

28

you have 18 months to do that, and then there's no capital gains of appreciation of the house that you sold." The instruction correctly stated the law and was relevant to issues developed in the case. (See Rev. & Tax Code, § 121.)

### D. *Supplemental Judgment*

Weinkauf argues that if his appeal is successful in reversing the judgment, the supplemental judgment must also be reversed because Quintero would no longer be the "prevailing party" entitled to attorney fees and costs. (Code Civ. Proc., §§ 1021.4, 1032, 1033.5.) Given we affirm the judgment for the reasons described above, we reject this argument.

## III. DISPOSITION

The judgment and supplemental judgment are affirmed. Respondent to recover costs on appeal.

STREETER, J.

WE CONCUR:

POLLAK, P. J.
ROSS, J.*

---

*Judge of the Superior Court of California, City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

29

Filed 4/1/22

**CERTIFIED FOR PARTIAL PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| ADRIANA J. QUINTERO, | A159812, A162688 |
| Plaintiff and Respondent, | (San Mateo County Super. Ct. No. 18-CIV-05383) |
| v. | |
| STEVEN A. WEINKAUF, | **ORDER GRANTING IN PART REQUEST TO CERTIFY OPINION FOR PUBLICATION, MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT** |
| Defendant and Appellant. | |

THE COURT[*]:

The opinion in the above-entitled matter filed on March 3, 2022, was not certified for publication in the Official Reports.  The Family Violence Appellate Project has filed a request that the opinion be published.  For good cause it now appears that the opinion should be partially published[3] in the Official Reports and it is so ordered.

The petition for rehearing filed on March 15, 2022, by appellant Steven A. Weinkauf is denied, subject to the following modification of the opinion filed in this appeal on March 3, 2022:

---

[*] Pollak, P. J., Streeter, J., Ross, J. (Judge of the Superior Court of California, County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution).

[3] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, the opinion filed on March 3, 2022, is certified for publication with the exception of parts II.A.–B., II.C.1.–6., II.C.8.–10., and II.D.

1

1.  On page 1, at the end of the second paragraph which concludes, "We affirm." add the following language continuing within the same paragraph:

    We also grant, in part, a request from the Family Violence Appellate Project (FVAP) for publication of the unpublished opinion in this case filed March 3, 2022.

2.  On page 20, in the first paragraph under part II.C.3. "Motions on Evidence of Offsets" in the first sentence, item number (3), change the word "minimum" to "mandatory" in the phrase preceding "(MCLE)" so that the passage reads:

    (3) Weinkauf's two affirmative defenses for emotional distress offset, based on Quintero's alleged refusal to return a file of Weinkauf's mandatory continuing legal education (MCLE) records and alleged access of another attorney's probate file without permission.

3.  On page 23, in the first paragraph under part II.C.7. "Sufficiency of Evidence" insert the following language immediately before the first sentence which begins, "Weinkauf argues . . ." so that the paragraph begins:

    Our unpublished opinion in this case rejected all of Weinkauf's many claims of error, but we agree with FVAP that our discussion of one of his arguments—his sufficiency of the evidence attack on the stalking verdict—is worthy of publication.

4.  On page 23, delete the subheading for part II.C.7. ("7. Sufficiency of Evidence") but retain all of the text under that subheading which will comprise the entire published portion under part II. (Discussion).

5.  On page 29, in the asterisked footnote, delete the words, "City and" so that the footnote reads:

    * Judge of the Superior Court of California, County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

The modifications effect no change in the judgment.


Dated:  April 1, 2022                                        STREETER, J.

Trial Court:   Superior Court of California, County of San Mateo

Trial Judge:   Hon. Gerald J. Buchwald

Counsel:        Steven A. Weinkauf, in pro. per., for Defendant and Appellant.

                Law Office of Alison J. Mannwieler and Alison J. Mannwieler,
                    for Plaintiff and Respondent.